**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David B. PASQUANTINO,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Carl J. Pasquantino, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Arthur Hilts, a/k/a Butch,**
**Defendant–Appellant.**

Nos. 01–4463, 01–4464, 01–4465.

United States Court of Appeals,
Fourth Circuit.

Argued: April 2, 2003.

Decided: July 18, 2003.

---

**ARGUED:** Bruce Robert Bryan, Syracuse, New York; Jensen Egerton Barber, Jensen E. Barber & Associates, Washington, D.C.; Isaac Joe, Jr., Baltimore, Maryland, for Appellants. Gregory Welsh, First Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael J. McCarthy, Bowie, Maryland, for Appellant Carl Pasquantino. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

Before WILKINS, Chief Judge, WIDENER, WILKINSON, NIEMEYER, WILLIAMS, MICHAEL, TRAXLER, KING, GREGORY, and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge HAMILTON wrote the opinion, in which Chief Judge WILKINS and Judges WIDENER, WILKINSON, NIEMEYER, WILLIAMS, TRAXLER, KING, and SHEDD joined. Judge GREGORY wrote a dissenting opinion, in which Judge MICHAEL joined.

## OPINION

HAMILTON, Senior Circuit Judge:

David Pasquantino, Carl Pasquantino, and Arthur Hilts (collectively the Defendants) were convicted of using interstate wires for the purpose of executing a scheme to defraud Canada and the Province of Ontario of excise duties and tax revenues relating to the importation and sale of liquor. According to the Defendants, their convictions and sentences cannot stand because, *inter alia,* application of the common law revenue rule precludes prosecution under the federal wire fraud statute, 18 U.S.C. § 1343, for use of interstate wires for the purpose of executing a scheme to defraud a foreign sovereign of its property rights in accrued tax revenue. Sitting *en banc,* we reject this argument and hold that the common law revenue rule does not preclude prosecution under the wire fraud statute for use of interstate wires for the purpose of executing a scheme to defraud a foreign sovereign of its property rights in accrued tax revenue. We also reject the Defendants' other arguments in challenge of their convictions and Hilts' challenge to his sentence. Accordingly, we affirm.

I.

Viewed in the light most favorable to the government, the evidence at trial revealed a substantial liquor smuggling operation beginning in 1996 and continuing through May 2000. No doubt this smuggling operation was spawned to supply a black mar-

ket for liquor in Canada that had been created when, some years ago, Canada increased the sin taxes on liquor to such a level that Canadian taxes significantly exceeded comparable United States taxes.

Brothers David and Carl Pasquantino, residents of Niagara Falls, New York, devised and headed the smuggling operation, which constituted a scheme to defraud Canada and the Province of Ontario of excise duties and tax revenues relating to the importation and sale of liquor in Canada. The scheme to defraud generally operated as follows: (1) while in New York, Carl or David Pasquantino would place a large order for low-end liquor by telephone with a discount liquor store in Maryland; (2) a driver such as Arthur Hilts used a rented truck to pick up the liquor from the discount liquor store in Maryland and transport it to New York for storage; and (3) a driver smuggled a lesser quantity of the liquor across the Canadian border in the trunk of a vehicle.

After agents from the United States Bureau of Alcohol, Tobacco, and Firearms (ATF agents) discovered that eight discount retail liquor stores in Maryland had purchased unusually large quantities of low-end liquor from wholesalers, a criminal investigation ensued. Two of the store owners cooperated proactively with ATF agents by recording telephone conversations and advising the agents of calls and visits by the Defendants.[1] Moreover, ATF agents obtained numerous telephone, truck rental, and motel records, all of which evidenced the scheme. Border crossings were monitored electronically, tracking license plates of vehicles entering Canada. Several vehicles that were registered to drivers involved in the scheme failed to stop for a second inspection when requested. ATF agents and Royal Canadian Mounted Police also conducted surveillance of David and Carl Pasquantino and their associates loading liquor in Maryland and unloading it in Canada after it was smuggled through Canadian customs. Marked bottles of liquor were recovered in Canada.

Subsequently, the Defendants were indicted, along with four other individuals, on six counts of wire fraud and aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 2 and 1343.[2] The Defendants filed a pretrial motion to dismiss the indictment on the ground that the common law revenue rule barred their prosecution under the federal wire fraud statute. Alternatively, the Defendants grounded their dismissal motion on the basis that accrued tax revenue does not constitute property under the federal wire fraud statute. Following the district court's denial of the motion, the case proceeded to trial before a jury.

At trial, the eight Maryland liquor store owners testified for the government regarding their dealings with the Pasquantinos. Three identified Hilts as one of the drivers who picked up large orders of li-

---

1. In exchange for their cooperation, the store owners were not prosecuted for violations of United States Department of Treasury Regulations which required that they record and report bulk sales of alcohol.

2. At the time of the offenses charged in the indictment, the wire fraud statute provided, in relevant part:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343 (2000).

quor for the Pasquantinos. In addition to the store owners, two men who had been involved in the scheme testified that they transported liquor for David and Carl Pasquantino from the United States into Canada, and that the Pasquantinos paid them cash for each run. Canadian Customs Intelligence Officer Gina Jonah (Officer Jonah) testified that there is a Canadian federal excise tax and general sales tax, as well as a Liquor Control Board of Ontario tax and a provincial sales tax on liquor imported from the United States into Canada. Officer Jonah, a seventeen-year veteran employee of Canadian Customs, explained that the equivalent of approximately one-hundred American dollars would be due and owing on a case of liquor that was purchased in the United States for fifty-six American dollars and imported into Canada. She stated that generally the amount of Canadian tax due is twice the purchase price of the case of liquor in the United States.

David and Carl Pasquantino were convicted on all six counts of the indictment and sentenced to fifty-seven months' imprisonment on each count, to be served concurrently. Before the case was submitted to the jury, the district court dismissed all but Count I against Arthur Hilts. Hilts was convicted on that count and sentenced to twenty-one months' imprisonment. This timely appeal followed.

The Defendants' convictions were subsequently vacated by a two-to-one panel decision. *United States v. Pasquantino*, 305 F.3d 291 (4th Cir.2002), *vacated and reh'g en banc granted*, (4th Cir.2003). Upon the government's suggestion, a majority of full-time, active circuit judges voted to rehear the case *en banc*.

## II.

The Defendants' primary argument is that the district court erred in denying their motion to dismiss because the common law revenue rule precludes their prosecution on federal wire fraud charges. The Defendants' argument presents an issue of first impression in the Fourth Circuit. To be clear, the issue is whether application of the common law revenue rule puts beyond the reach of the federal wire fraud statute, 18 U.S.C. § 1343, the use of interstate wires for the purpose of executing a scheme to defraud a foreign sovereign of its property rights in accrued tax revenue.

We begin our analysis of this issue by recognizing that its resolution depends in large measure upon determining the proper formulation of the common law revenue rule in American jurisprudence. Assuming *arguendo* that a government's right to accrued tax revenue constitutes property for purposes of the wire fraud statute (an issue we address in Part III of this opinion), the wire fraud statute, on its face, criminalizes the Defendants' conduct of engaging in a scheme to defraud Canada and the Province of Ontario of tax revenue. Under relevant Supreme Court precedent, the only circumstance under which we may hold that this conduct is beyond the reach of the wire fraud statute is if, at the time Congress enacted the wire fraud statute in July 1952, well established common law provided that the courts of one sovereign were prohibited from recognizing the existence of the revenue laws of a foreign sovereign. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("where a common-law principle is well established ... the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident") (internal quotation marks and citations omitted). Without the existence of such well-established common law, our

setting aside of the Defendants' convictions and sentences as posited by the Defendants would be *ultra vires. Id.* ("Courts do not, of course, have free rein to impose [common law] rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand.").

■ A logical starting point in determining the proper formulation of the common law revenue rule in American jurisprudence is the Restatement (Third) of Foreign Relations Law of the United States (1987) (hereinafter "the Restatement"), which courts often rely upon as an authoritative exposition of the foreign relations law of the United States. *See, e.g., C & L Enters. Inc. v. Citizen Band Potawatomi Indian Tribe of OK,* 532 U.S. 411, 421 n. 3, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001); *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *United States v. Boots,* 80 F.3d 580, 587 (1st Cir.1996); *Palma v. Verdeyen,* 676 F.2d 100, 106 n. 5 (4th Cir.1982). Section 483 of the Restatement provides the following formulation of the common law revenue rule: "Courts in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states." The Restatement § 483.

The formulation of the common law revenue rule found in most case law is nearly identical to that of the Restatement. For example, in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings,Inc.,* 268 F.3d 103 (2d Cir.2001), *cert. denied,* 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002), the Second Circuit described the common law revenue rule as "a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Id.* at 109. Similarly, the First Circuit, in *Boots,* stat-

ed that the common law revenue rule "holds that courts generally will not enforce foreign tax judgments...." *Boots,* 80 F.3d at 587 (citing the Restatement § 483 as authority). The Ninth Circuit, in *Her Majesty the Queen ex rel. B.C. v. Gilbertson,* 597 F.2d 1161 (9th Cir.1979), the first federal case ever to invoke the common law revenue rule in the international context, described the common law revenue rule as an exception to the general rule that judgments from a foreign country are recognized by the courts of this country when the general principles of comity are satisfied. *Id.* at 1163. And although the Supreme Court has never passed upon the precise scope of the common law revenue rule, in 1964, it noted that many courts in the United States have adhered to the principle that "a court need not give effect to the penal or revenue laws of foreign countries." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 413, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

Some rationales commonly given for the formulation of the common law revenue rule as found in the Restatement and the case law in accord are: (1) the reluctance of courts to subject foreign public law to potentially embarrassing judicial scrutiny, *see, e.g., Her Majesty the Queen ex rel. B.C.,* 597 F.2d at 1164–65; (2) the courts of one nation have no obligation to further the governmental interests of a foreign nation, *see, e.g., Sabbatino,* 376 U.S. at 448, 84 S.Ct. 923 (White, J., dissenting on other grounds); and (3) the noninterference by the judicial branch in matters of foreign policy which fall within the exclusive province of the executive and legislative branches of our federal government, *see, e.g., Attorney Gen. of Canada,* 268 F.3d at 114.

The Defendants discount the Restatement's formulation of the common law revenue rule and that of the case law in

accord as too narrow and merely evincing the typical application of the rule. The actual rule, they claim, is much broader and provides that no nation, under any circumstances, shall ever recognize the tax laws of a foreign sovereign. The Defendants then argue that because their convictions on the wire fraud charges in this case would necessarily require an American court to recognize certain revenue laws of Canada and the Province of Ontario, the common law revenue rule precludes their prosecution. Thus, as applied in the present case, the Defendants view the common law revenue rule as an absolute prohibition on American courts from recognizing a revenue law of a foreign sovereign in any context.

The Defendants cite the separation of powers rationale and the avoid embarrassment rationale as the two rationales for their version of the common law revenue rule. Additionally, they posit that application (of their version) of the common law revenue rule to vacate their wire fraud convictions and sentences serves both of these rationales.

In support of their broad formulation of the common law revenue rule, the Defendants rely on *dicta* in two eighteenth-century, British contract cases written by Lord Mansfield. The first case is *Holman v. Johnson*, 98 Eng. Rep. 1120 (K.B.1775). The subject of the contract in *Holman* was the sale of tea in France, which tea the parties knew was to be smuggled into England to avoid English customs duties. The French seller sued the English buyer in England to recover the purchase price. *Id.* The English buyer argued in defense that the contract was void for an illegal purpose. *Id.*

Lord Mansfield first determined the conflict of laws issue in that case as follows:

There can be no doubt, but that every action tried here must be tried by the law of England; but the law of England says, that in a variety of circumstances, with regard to contracts legally made abroad, the laws of the country where the cause of action arose shall govern. There are a great many cases which every country says shall be determined by the laws of foreign countries where they arise. But I do not see how the principles on which that doctrine obtains are applicable to the present case. *For no country ever takes notice of the revenue laws of another.*

*Id.* at 1121 (emphasis added). Lord Mansfield then discussed whether the French seller had engaged in an illegal act:

This is an action brought merely for goods sold and delivered at Dunkirk[, France]. Where then, or in what respect is the plaintiff guilty of any crime? Is there any law of England transgressed by a person making a complete sale of a parcel of goods at Dunkirk, and giving credit for them? The contract is complete, and nothing is left to be done.

*Id.* Clearly, Lord Mansfield's statement concerning whether a country would recognize the revenue laws of a foreign sovereign was not made in the context of his decision on the merits of the case, but on the choice of law issue. Indeed, in the words of one legal commentator, such statement "was not directed to the merits of the case; it was not necessary to decide the case, and was therefore dictum." William J. Kovatch, Jr., *Recognizing Foreign Tax Judgments: An argument for the revocation of the revenue rule*, 22 Hous. J. Int'l L. 265, 276 (2000). *See Her Majesty the Queen ex rel. B.C.*, 597 F.2d at 1164 (characterizing as *dictum* Lord Mansfield's statement in *Holman* regarding whether a country would recognize the revenue laws of a foreign sovereign).

The second case upon which the Defendants rely is *Planche v. Fletcher*, 99 Eng. Rep. 164 (1779). The plaintiff in *Planche* obtained insurance for cargo aboard a ship in England ultimately bound for France. *Id.* Following destruction of the cargo, the plaintiff sued the insurance company for payment and won. *Id.*

On appeal, the insurance company challenged the verdict on the ground that the plaintiff had fraudulently obtained the insurance policy by declaring a false shipping route in order to avoid paying higher French duties on goods imported from England as compared to goods imported from Belgium. Lord Mansfield held that no fraud existed because "[w]hat had been practiced in this case was proved to be constant course of trade, and notoriously so to every body." *Id.* at 165. After eschewing the existence of any fraud on the part of the plaintiff, Lord Mansfield added in dictum: "But, at any rate, this was no fraud in this country. One nation does not take notice of the revenue laws of another." *Id.* *See Her Majesty the Queen ex rel. B.C.*, 597 F.2d at 1164 (characterizing as *dictum* Lord Mansfield's statement in *Planche* regarding whether a country would recognize the revenue laws of a foreign sovereign).

The Defendants have two significant problems with relying on *Holman* and *Planche* as authority for defining the common law revenue rule as a prohibition on the courts of one nation from recognizing the revenue laws of a foreign sovereign in any context. The first significant problem is that the statements they rely upon in the two cases are pure and simple dicta, and, therefore, cannot serve as a source of binding authority in American jurisprudence. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("[T]his Court is bound by holdings, not language."); *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend...."); *United States v. Dixon*, 509 U.S. 688, 706, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (quoting *United States Nat. Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 463, n. 11, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), on " 'the need to distinguish an opinion's holding from its dicta' "). The second significant problem is that the two rationales that the Defendants cite in support of their expansive version of the common law revenue rule are not even traceable to *Holman* and *Planche*. Rather, the statements by Lord Mansfield in those cases upon which the Defendants rely have as their sole rationale the protection of British trade from the oppressiveness of high foreign customs duties. *See Attorney Gen. of Canada*, 268 F.3d at 110; William S. Dodge, *Breaking the Public Law Taboo*, 43 Harv. Int'l L.J. 161, 170 (2002).

In short, *Holman* and *Planche* are inadequate authority for the proposition that, at the time Congress enacted the wire fraud statute in 1952, it was well-established at common law that the courts of one nation could never recognize the revenue laws of a foreign sovereign. Indeed, all persuasive authority supports the position that the Restatement's formulation of the common law revenue rule and that of the case law in accord reflects the formulation of the common law revenue rule in existence at the time that Congress enacted the wire fraud statute in 1952. Critically, such formulation speaks in permissive not mandatory terms and pertains to the nonenforcement of foreign tax judgments as opposed to the nonrecognition of foreign revenue laws.[3]

Under these circumstances, we cannot presume that when Congress enacted the wire fraud statute in 1952, it did so with the intent that any prosecution thereunder could not involve recognition or observance of the revenue laws of a foreign sovereign. *Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 108, 111 S.Ct. 2166. Without such a presumption, we have no basis upon which to ignore the plain language of the wire fraud statute, which language (assuming *arguendo* that a sovereign's right to tax revenue constitutes property for purposes of the wire fraud statute) squarely encompasses the Defendants' conduct.

The Defendants make a related alternative argument that even application of the Restatement version of the common law revenue rule requires that we vacate their convictions and sentences under the wire fraud statute, asserting that our affirmance of their convictions and sentences would be the functional equivalent of enforcing the revenue laws of Canada and the Province of Ontario.

We candidly acknowledge that the Defendants' argument is not without support. In *Boots*, the defendants had been convicted of wire fraud for their participation in a scheme, using interstate wires, to defraud Canada and the Province of Nova Scotia of excise duties and tax revenues due on im-

ported tobacco. *Boots*, 80 F.3d at 583. The First Circuit vacated the convictions in large measure on the basis that "upholding defendants' section 1343 conviction [s] would amount functionally to penal enforcement of Canadian customs and tax laws" in violation of the common law revenue rule. *Id.* at 587. The First Circuit reached this conclusion on the basis that conviction of the defendants effectively required it and the district court to pass upon the validity and operation of a foreign sovereign's revenue laws, thus implicating the important concerns underlying the common law revenue rule.[4] *Id.* According to the First Circuit, national policy judgments of the legislative and executive branches in the area of foreign policy could be undermined, and the revenue laws of a foreign sovereign subjected to intrusive scrutiny, were federal courts to uphold prosecutions of wire fraud schemes aimed at violating the revenue laws of a foreign sovereign. *Id.* at 587–88.

We reject the Defendants' argument that affirmance of their convictions and sentences for wire fraud would be the functional equivalent of enforcing the revenue laws of Canada and the Province of Ontario, and thus in violation of the common law revenue rule. In making this argument, the Defendants, and the First Circuit in *Boots* for that matter, miss the

---

**3.** The dissent relies on this sentence to charge that rather than applying the Restatement's formulation of the common law revenue rule as stated, we have "narrow[ed] its application only to those rare instances in which a court is compelled · to actually enforce the judgment of a foreign court." *Post* at 338. The dissent completely misreads the sentence, which expressly recognizes that the Restatement's formulation of the common law revenue rule "speaks in permissive not mandatory terms." Further-more, the dissent's charge misses the critical distinction between the nonenforcement (or nonrecognition) of *foreign tax judgments*, as is addressed

in the Restatement's formulation of the common law revenue rule, with the nonenforcement (or nonrecognition) of *foreign revenue laws*, which is not at all addressed in that formulation. The distinction is critical because prosecution of the Defendants depended neither upon the enforcement nor recognition of a foreign tax judgment.

**4.** Notably, the *Boots* court relied upon the Restatement as authority for defining the common law revenue rule as follows: [C]ourts generally will not enforce foreign tax judgments. . . . *Boots*, 80 F.3d at 587.

critical point that prosecution for violation of the federal wire fraud statute, even when the subject of the wire fraud scheme involved is certain tax revenue due a foreign sovereign, does nothing civilly or criminally to enforce any tax judgments or claims that the foreign sovereign has or may later obtain against the defendant. Neither does such prosecution enforce the revenue laws of the foreign sovereign involved. Rather, such prosecution seeks only to enforce the federal wire fraud statute for the singular goal of vindicating our government's substantial interest in preventing our nation's interstate wire communication systems from being used in furtherance of criminal fraudulent enterprises. Thus, the fact that the property at issue in the Defendants' wire fraud scheme belonged to foreign governments by virtue of those governments' respective revenue laws is merely incidental to prosecution under the federal wire fraud statute.

Moreover, affirming the Defendants' wire fraud convictions and sentences in this case presents no separation of powers problems, the only rationale of the common law revenue rule with jurisdictional underpinnings. Congress enacted the wire fraud statute and the United States Attorney, acting on behalf of the United States as directed by the Executive Branch, made the decision to seek the Defendants' indictment thereunder. Thus, to the extent matters of foreign policy were implicated by prosecution of the Defendants on the wire fraud charges in this case, such matters were passed upon by the only two branches of our federal government charged by our Constitution with the power to make foreign policy decisions. *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (declaring that decisions as to foreign policy "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative"). However, we have no doubt that a significant separation of powers problem would arise were we to play diplomat from the bench by relying on a novel expansion of the common law revenue rule, no doubt a policy laden rule, to set aside the Defendants' wire fraud convictions and sentences.

We find strong support for our rejection of the Defendants' arguments involving the common law revenue rule in *United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997). In that case, the Second Circuit considered whether a scheme (essentially identical to the one before us) to defraud Canada of tax revenue is cognizable under the federal wire fraud statute, 18 U.S.C. § 1343. *Trapilo,* 130 F.3d at 548. The Second Circuit held that "[t]he statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute." *Id.* at 551.

In sum, we hold the district court did not err in denying the Defendants' motion to dismiss the indictment, which motion the Defendants premised upon their argument that the common law revenue rule precludes their prosecution for wire fraud.

## III.

The Defendants next argue that under the Supreme Court's decision in *Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), a government's right to collect accrued tax revenue is not a property right for purposes of the wire fraud statute. In this regard, the Defendants rely on the following language from *Cleveland:* "It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands;

for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland,* 531 U.S. at 15, 121 S.Ct. 365.

The Defendants' reliance on this language in *Cleveland* is completely misplaced. The defendant in *Cleveland* was prosecuted under the mail fraud statute (sister of the wire fraud statute), 18 U.S.C. § 1341, for making false statements in applying to the Louisiana State Police for a license to operate video poker machines.[5] The Supreme Court held that permits or licenses of this order do not qualify as "property" for purposes of the mail fraud statute. *Id.* at 16, 26–27, 121 S.Ct. 365. The Court reached this holding on the bases that the property at issue had to be property that was valuable in the hands of the victim, not just valuable in the hands of the defendant, and that an unissued video poker license did not constitute property that was valuable in the hands of the State of Louisiana.[6] *Id.* at 22–27, 121 S.Ct. 365.

■ In contrast to the facts in *Cleveland,* because a government has a property right in tax revenues when they accrue, *see Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 566, 70 S.Ct. 386, 94 L.Ed. 346 (1950), the tax revenues owed Canada and the Province of Ontario by reason of the Defendants' conduct in the present case constitute property for purposes of the wire fraud statute. *United States v. Brewer,* 528 F.2d 492, 495 (4th Cir.1975) (holding that plain language of the mail fraud statute "condemns any scheme to defraud in which the mails are employed, *including the evasion of sales and use taxes"*) (emphasis added). Indeed, the

Court in *Cleveland* conspicuously pointed out that the government in that case had "nowhere allege[d] that Cleveland defrauded the State of any money to which the State was entitled by law." *Cleveland,* 531 U.S. at 22, 121 S.Ct. 365. In sum, we hold that Canada and the Province of Ontario's right to accrued tax revenue constitutes a sufficient property right for wire fraud purposes, unaffected by the Court's decision in *Cleveland.*

## IV.

■ The Defendants make several challenges to the sufficiency of the evidence in support of their convictions. We review the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction. *United States v. Burgos,* 94 F.3d 849, 860 (4th Cir.1996) (*en banc*). In determining whether the evidence in the record is substantial, we examine whether there "is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at 862. We are also mindful that our reversal of a conviction on grounds of insufficient evidence is " 'confined to cases where the prosecution's failure is clear.' " *United States v. Jones,* 735 F.2d 785, 791 (4th Cir.1984) (quoting *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

■ Wire fraud is established through the existence of a scheme to defraud and the use of interstate wires in

---

**5.** Because the mail and wire fraud statutes share the same language in relevant part, we apply the same analysis to both offenses. *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

**6.** Indeed, a great deal of the Court's opinion is devoted to a discussion of why an unissued video poker license is of no monetary value to the State of Louisiana. *Cleveland,* 531 U.S. at 20–25, 121 S.Ct. 365.

furtherance of that scheme. *United States v. Bollin,* 264 F.3d 391, 407 (4th Cir.2001), *cert. denied,* 534 U.S. 935, 122 S.Ct. 303, 151 L.Ed.2d 225 (2001) and 535 U.S. 989, 122 S.Ct. 1544, 152 L.Ed.2d 469 (2002). The scheme or artifice to defraud can be in the form of an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive. *United States v. Colton,* 231 F.3d 890, 899–901 (4th Cir. 2000). A fact is material if it has a natural tendency to influence or is capable of influencing the intended victim. *Neder v. United States,* 527 U.S. 1, 22, 24, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). *Cf. United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).

### A. *Materiality.*

■ The Defendants contend that, assuming *arguendo* they had engaged in a scheme to defraud Canada and the Province of Ontario of excise duties and tax revenues by virtue of a liquor smuggling operation, the evidence was insufficient to establish that such scheme depended upon a material falsehood or active concealment of a material fact. We disagree. Reasonable inferences from the evidence at trial establish that the Defendants' scheme depended in large measure upon their purposeful routine failure to declare their possession of imported liquor when asked to declare any "goods that [they had] entering Canada" by a Canadian Customs Officer in the Primary Inspection Line at the United States/Canadian border. (J.A. 179). We have no doubt that such failure to declare was capable of influencing Canadian Customs Officers to allow vehicles containing concealed liquor to proceed on into Canada without further inspection by Canadian Customs Officials for the purpose of identifying goods subject to excise duties and taxes. Accordingly, we hold the evidence was sufficient to establish their active concealment of a material fact with intent to deceive. *Cf. Brewer,* 528 F.2d at 496 (defendant's scheme to sell cigarettes into another state through the mail without registering with tax officials in that state, as required by the Jenkins Act, in order that purchasers in that state could avoid paying sales taxes on the cigarettes constitutes mail fraud).

### B. *Existence of Tax Laws.*

Next, the Defendants contest the sufficiency of the evidence to establish that liquor imported into Canada and the Province of Ontario is subject to excise duties and other taxes. The Defendants argue that without such evidence the government failed to show that the wire fraud scheme charged in this case sought to deprive Canada or the Province of Ontario of any property interest. In a similar vein, the Defendants also argue that the evidence was insufficient to prove that they personally owed Canada or the Province of Ontario any taxes in connection with the liquor that they are alleged to have smuggled.

■ We reject these arguments. First, we hold that the evidence was sufficient to prove beyond a reasonable doubt that liquor imported into Canada and the Province of Ontario was subject to excise duties and other applicable taxes at the time of the Defendants' conduct as charged in this case. The evidence is in the form of trial testimony by Officer Jonah. Based upon her seventeen years of employment experience with Canadian Customs, Officer Jonah testified that she was familiar with the rules and regulations that pertain to the importation of alcoholic beverages into Canada. Then, in answer to government counsel's request that she describe for the

court and the jury what, if any, taxes or duties are due and owing on alcohol that is imported from the United States into Canada, Officer Jonah testified as follows:

> Alcohol is taxed very high in Canada. There is an excise tax, that is a federal tax, that is applied, depending on the value of it, the U.S. purchase price. There is a general sales tax that is also a federal tax. There is a Liquor Control Board of Ontario tax. And there also is a provincial sales tax.

(J.A. 177). Officer Jonah further testified that, in preparation for her testimony, she calculated that the Canadian and Province of Ontario taxes that would be due and owing on a case of imported alcohol that was purchased in the United States for fifty-six American dollars would be approximately one hundred American dollars, which converts to approximately 157 Canadian dollars.

Even though Officer Jonah did not specifically state that the taxes of which she was speaking were in force at the time of the Defendants' conduct as charged in this case, the context of her entire testimony permitted the jury to draw this reasonable inference. For example, Officer Jonah was assigned to investigate the Defendants on suspicion of liquor smuggling based upon their conduct as charged in this case. In sum, we have no reservations that the evidence at trial was sufficient to prove beyond a reasonable doubt that liquor imported into Canada and the Province of Ontario was subject to excise duties and other applicable taxes at the time of the Defendants' conduct as charged in this case.

■ Second, the Defendants' challenge to the sufficiency of the evidence establishing that they personally owed Canada or the Province of Ontario any taxes in connection with the liquor that they are alleged to have smuggled completely misses the mark. Proof that the Defendants personally owed such taxes is not required under the wire fraud statute as long as there was proof that they participated in a fraudulent scheme to enable someone to avoid such taxes. *Cf. Brewer*, 528 F.2d at 496 (where defendant knowingly devised mail fraud scheme to enable Florida residents to obtain cigarettes without declaring them for taxation, it was no defense to mail fraud prosecution that defendant herself owed no tax). The testimony of Officer Jonah that we just discussed serves as such proof in this case. Indeed, from the testimony of Officer Jonah and the overall context in which it was given in relation to the joint United States and Canadian investigation which led to this prosecution, it was a reasonable inference that the Canadian taxes were due by the importer upon importation of liquor into Canada. The jury found and at trial the Defendants never challenged the proposition that such taxes were due by the importer. Nonetheless, as we recognized in *Brewer*, the defendant could not avoid prosecution under the federal mail fraud statute on the ground that she herself owed no taxes on the cigarettes she smuggled into Florida from North Carolina. *Id.* The quintessential element is that the scheme in the present case involved defrauding the Canadian authorities of revenue taxes on imported liquor regardless of what party had responsibility for the payment of those taxes. The precise time when the taxes are owed and whom they are due from are not elements of the offense. What is required is proof that such taxes were due and the conduct involved a scheme to defraud the Canadian authorities of the taxes.

### C. *Hilts' Participation.*

■ Finally, we address Hilts' specific challenge to the sufficiency of the

evidence to support his conviction on Count I. Count I charged the substantive crime of wire fraud, 18 U.S.C. § 1343, and the adjunct crime of aiding and abetting wire fraud, 18 U.S.C. § 2.[7] Pursuant to 18 U.S.C. § 2, one who aids or abets the commission of an offense "is punishable as a principal." We have held that "[a] defendant is guilty of aiding and abetting if he has knowingly associated himself with and participated in the criminal venture." *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir.1996) (*en banc*) (internal quotation marks omitted). Significantly, in order "to be convicted of aiding and abetting, participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about the result." *Id.* (internal quotation marks and alteration marks omitted). Of particular relevance here, to be convicted of aiding and abetting a wire fraud offense, it is not necessary for the defendant to be directly or personally involved in the wire communication as long as the wire communication was reasonably foreseeable to the defendant in the execution of the alleged scheme

to defraud in which the defendant is accused of participating. *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir.1994).

The specific interstate communication charged as the basis for Count I was a telephone call from David Pasquantino in Niagara Falls, New York, to Valley Wine and Spirits in Hagerstown, Maryland, on March 9, 1999. David's brother Carl was also charged as a participant in the wire fraud scheme set forth in Count I. According to the indictment, the wire fraud scheme to defraud Canada and the Province of Ontario of excise duties and other taxes as charged in Count I began in or about March 1997 and lasted until the date of indictment, April 13, 2000.

Hilts primarily challenges the sufficiency of the evidence to establish that he knowingly and willfully participated in the wire fraud scheme charged in Count I with knowledge of its fraudulent nature. He claims that his conduct in picking up the large loads of liquor from the various discount liquor stores in Maryland was completely innocent, and points out that there is no evidence that he ever picked up any liquor from Valley Wine and Spirits nor

---

**7.** As a housekeeping matter, we note that although the written judgment for Hilts specifies that he was convicted of Count I of the indictment, it does not specify the statutory section for aiding and abetting, nor does it describe the nature of the offense with respect to Count I as aiding and abetting. Rather, it only specifies the statutory section for wire fraud and describes the nature of the offense with respect to Count I as "WIRE FRAUD." (J.A. 351). Given that Count I of the indictment charged Hilts with aiding and abetting wire fraud along with the substantive offense of wire fraud, the district court instructed the jury on aiding and abetting with respect to Count I, Hilts' counsel discussed the aiding and abetting aspect of Count I in his closing argument before the jury, and the jury returned an unequivocal oral verdict finding Hilts guilty of Count I, we have no doubt that the failure of the written judgment to specifically reflect the aiding and abetting aspect of

Count I was a clerical error. However, such detail need not concern us further in this appeal. The written judgment's explicit reference to Count I of the indictment sufficiently incorporates 18 U.S.C. § 2 for our purposes. *See United States v. Allen*, 675 F.2d 1373, 1385 (9th Cir.1980) (although Count III of indictment charged defendant with aiding and abetting while written judgment of Count III only specifically cited the substantive offense, the written judgment's provision that the defendant was convicted of Count III *"as charged in Count 3 of the indictment,"* was sufficient to incorporate 18 U.S.C. § 2). We do point out, however, that pursuant to Federal Rule of Criminal Procedure 36, the district court has the authority to correct the mistake. Fed.R.Crim.P. 36 (After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment ... arising from oversight or omission).

any evidence linking him to the telephone call charged as the basis for Count I.

■ The government's theory at trial was that Hilts participated in the wire fraud scheme charged in Count I as a pick up and delivery driver with knowledge that the liquor he was handling would ultimately be smuggled into Canada without paying Canada or the Province of Ontario the applicable taxes. We hold the evidence in the record is sufficient to sustain Hilts' conviction on Count I. Viewed in the light most favorable to the government, the evidence in the record shows that, between February 27, 1997 and April 22, 1998, Hilts rented a Ryder truck in Niagara Falls, New York, from the same business (Gaines Sunoco), on average every two weeks; traveled in the truck between 738 and 978 miles (usually around 815 miles); and returned the truck the very next day. Hilts resumed almost the identical pattern of behavior in November 1998 and continued it until April 28, 1999, when, after detecting that he was under surveillance by ATF agents from the time he had left BJ's liquor store in Maryland until he had arrived in upstate New York, Hilts abandoned the Ryder truck that he had rented the day before on the side of the road. At the time that Hilts abandoned the truck, it contained 222 cases of liquor. Prior to abandoning the truck, Hilts successfully made several evasive driving maneuvers in order to escape the surveillance.

The record also shows that during these same time periods, Hilts used the rented trucks to pick up large bulk orders of liquor from two different Maryland liquor stores (neither of them Valley Wine and Spirits) for Carl Pasquantino.[8] The record also shows that from September 23, 1998 to April 9, 1999, a vehicle registered to Hilts made thirty-nine trips from Niagara Falls, New York across the Rainbow Bridge into the Canadian Province of Ontario. However, such trips ceased completely after Hilts abandoned the Ryder rental truck on April 28, 1999.

Viewing the evidence just recited in the light most favorable to the government, we hold that a reasonable finder of fact could accept such evidence as adequate and sufficient to support a conclusion beyond a reasonable doubt that Hilts knowingly participated at various stages in the wire fraud scheme charged in Count I with knowledge that the liquor he was transporting would ultimately be smuggled into Canada without paying Canada or the Province of Ontario the applicable taxes due on such liquor. The fact that Hilts abandoned the liquor laden rental truck after detecting surveillance by ATF agents during a liquor run from Maryland to New York is strong evidence of his criminal intent. The same goes for his evasive driving maneuvers and the fact that his own vehicle did not cross the Rainbow Bridge after April 28, 1999. Furthermore, the mere fact that Hilts did not personally make the telephone call that is specifically alleged in Count I is of no import. The evidence supports a reasonable inference that the March 9, 1999 telephone call by David Pasquantino to Valley Wine & Spirits was reasonably foreseeable to Hilts in the execution of the fraudulent scheme alleged in Count I. *Griffith*, 17 F.3d at 874.

## V.

■ Finally, we address Hilts' challenge to his twenty-one month sentence.

---

**8.** One of the store owners (*i.e.*, the owner of BJ's Liquors) testified that Hilts always picked up the large bulk sale orders placed by Carl Pasquantino in a Ryder rental truck and that the first several times Hilts arrived at his store, Hilts already had cases of the same type of liquor on the truck.

Hilts contends that the district court clearly erred in calculating his fraud loss for purposes of determining his proper offense level under USSG § 2F1.1, the fraud guideline. His contention is without merit.

■ USSG § 2F1.1(a) provides a base offense level of six. USSG § 2F1.1(b)(1) provides for incremental increases to that base offense level based upon the amount of *"Loss,"* "[i]f the loss exceeded $2,000." District courts are permitted to use the *intended loss* to the victim of the fraudulent scheme at issue as the basis for determining *"Loss"* under USSG § 2F1.1(b)(1), "even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct." *United States v. Miller,* 316 F.3d 495, 502 (4th Cir.2003).

Of relevance to Hilts' sentencing challenge, under the heading "Offense Conduct," his Presentence Report (PSR) states that the government provided "this Probation Officer" with the following version of evidence and facts provided at trial:

> Testimony at trial established that defendant picked up liquor at Liquor Locker, JRJ Liquors, and BJ's Liquors until April 28, 1999. The cases from Liquor Locker will not be considered. Adding the cases from JRJ Liquors with those from BJ's through April 28, 1999, totals 12,974 cases. Applying a factor of 90% results in 11,676 cases. The loss for guideline purposes is thus $1,167,600.

(S.J.A., Vol.II, 9). The same section of the PSR also states that Hilts was taking the position that the evidence at trial could not support any amount of fraud loss. The PSR listed " + 11 or 0" as the number of offense levels by which to increase Hilts' base offense level in connection with USSG § 2F1.1(b)(1)(L).

At sentencing, after hearing argument from Hilts' attorney, the district court stated:

> I need not hear from [the government] on the amount of loss. I am persuaded from the evidence in trial that the amount of loss attributed by the government set forth in the Presentence Report is correct. And so far as the argument that Mr. Hilts contemplated that this would only stay within the United States, that was a fair argument. It was considered by the jury, which found beyond a reasonable doubt that it wasn't so. So accordingly, on the amount of loss, I need not hear from the government.

(Transcript of Hilts' Sentencing Hearing at 10–11). The district court ultimately adopted all of the proposed findings of the PSR with one exception not relevant here.

We may overturn the district court's $1,167,000 fraud loss finding with respect to Hilts only if we determine that it is clearly erroneous. *United States v. Bolden,* 325 F.3d 471, 495–96 (4th Cir.2003). Hilts attacks the district court's fraud loss finding chiefly on the basis that the record contains no evidence that he actually transported or assisted others in importing the liquor that he had picked up in Maryland into Canada. We reject this argument. Proof that Hilts actually transported or assisted others in importing the liquor that he picked up in Maryland into Canada is not required, while it is reasonably inferred from the number of times a vehicle registered to Hilts crossed into Canada and then ceased such activity immediately after Hilts abandoned the liquor laden rental truck. Rather, all that is required to support the district court's fraud loss finding is sufficient evidence from which to make a reasonable inference that Hilts intended that such liquor would eventually be smuggled into Canada in order to avoid paying Canada and the Province of Ontario the applicable excise

duties and other taxes. The evidence that we discussed in support of Hilts' conviction on Count I, when viewed collectively, constitutes such evidence. In sum, we affirm Hilts' sentence.

## VI.

In conclusion, we affirm the Defendants' convictions and Hilts' sentence.[9]

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

## I.

Pursuant to the common-law revenue rule, I find that the activities at issue in this case are not cognizable under the federal wire-fraud statute, 18 U.S.C. § 1343. Accordingly, I respectfully dissent.

## II.

### A.

The majority claims to rely on the Restatement's formulation of the revenue rule, which states, "Courts in the United States are not required *to recognize* or enforce judgments for the collection of taxes ... rendered by the courts of other states." *Ante,* at 327 (citing Restatement (Third) of the Law of Foreign Relations § 483) (emphasis added). Rather than applying this rule as stated, however, the majority narrows its application only to those rare instances in which a court is compelled to actually enforce the judgment of a foreign court, finding that the rule only "pertains to the *nonenforcement* of foreign tax judgments...." *Ante,* at 329 (emphasis added). In so holding, the majority reads the words "to recognize" completely out of the Restatement section on which it purportedly relies. With its con-

strained application of the revenue rule, the majority has created new law that does not find support in the Restatement, Supreme Court precedent, nor in any of the rulings from our sister circuits.

In *Banco Nacional de Cuba v. Sabbatino,* the Supreme Court suggested that the revenue rule would reach beyond actual enforcement of foreign tax judgments, and extend to any case in which a court would be compelled to "give effect to the ... revenue *laws* of foreign countries or sister states." 376 U.S. at 412, 413, 84 S.Ct. 923 (1964) (citing *Moore v. Mitchell,* 30 F.2d 600 (2d Cir.1929)) (emphasis added). Predating *Banco Nacional de Cuba,* the Court in *Milwaukee County v. M.E. White Company,* although not ultimately deciding the case on revenue rule grounds, specifically recognized that:

> [i]t has often been said, and in a few cases held, that statutes imposing taxes [as opposed to judgments enforcing those statutes] are not entitled to full faith and credit ... because the courts of one state should not be called upon to scrutinize the relations of a foreign state with its own citizens, such as are involved in its revenue laws, and thus commit the state of the forum to positions which might be seriously embarrassing to itself or its neighbors.

296 U.S. 268, 274–75 (1935) (internal footnotes omitted). In sum, long before Congress' passage of the wire fraud statute at issue in the present case, "the United States Supreme Court acknowledged the broad scope of the revenue rule." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 126 (2d Cir.2001) (citing *Milwaukee Co.,* 296 U.S. at 275, 56 S.Ct. 229).

---

**9.** We have reviewed the Defendants' remaining assignments of error and find them to be without merit.

Additionally, the First Circuit, in *United States v. Boots*, held that the revenue rule is implicated when a United States court is called upon to "effectively pass[ ] on the validity and operation of the revenue laws of a foreign country." 80 F.3d 580, 587 (1st Cir.1996). In *Boots*, the defendants took part in a scheme to transport tobacco from a Native American reservation in upstate New York into New Brunswick, Canada, without paying taxes and excise duties on the tobacco. To bypass customs checkpoints, the tobacco was transported surreptitiously into Canada through another reservation in Maine. The defendants were charged with and found guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371 and 1343. The First Circuit reversed the convictions, basing its decision primarily on the revenue rule. *Id.* at 583–84. The Court explained, "Although this case does not require us to enforce a foreign tax judgment as such, upholding defendants' section 1343 conviction would amount functionally to penal enforcement of Canadian customs and tax laws." *Id.* at 587. With this decision, the First Circuit recognized that the revenue rule applies not only when a foreign law is being enforced, but also when, as the Restatement suggests, an American court is compelled to "recognize" the validity of that foreign law. The *Boots* court continued:

> The scheme to defraud at issue—proof of which is essential to conviction—had as its sole object the violation of Canadian revenue laws. To convict therefore, the district court and this court must

determine whether a violation of Canadian tax laws was intended and, to the extent implemented, occurred. In so ruling, our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them.

*Id.* at 587.

Although it declined to exercise its discretion and dismiss the indictment before it, the Second Circuit, in *United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997), applied the same formulation of the revenue rule as did the *Boots* court. The *Trapilo* court found that because "there is no obligation to pass on the validity of Canadian revenue law, ... the common law revenue rule is not properly implicated." *Trapilo*, 130 F.3d at 552–553. That is, the court recognized the converse—had it been required to pass on the validity of a foreign tax law, the revenue rule would have been implicated. This would be true, the court implicitly conceded, even if it had *not* been required to enforce a judgment based on an application of that law.[1]

This statement of the rule was reaffirmed by the Second Circuit in *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, where the court held, "[U]nder the revenue rule, United States courts avoid the application of a foreign sovereign's tax laws" in order to "avoid entanglement with questions about the underlying validity of a foreign sovereign's laws." 268 F.3d at 126. While acknowledging that "the precise scope of the rule"

---

1. As explained in Part II.B., *infra*, although the *Trapilo* court correctly summarized the common-law revenue rule, the court erred in its application of the rule. In fact, the court's ruling in *Trapilo*, which reversed the district judge's decision to dismiss the indictment against the defendants, was called into doubt by the Second Circuit's subsequent decision in *United States v. Pierce*, 224 F.3d 158 (2d Cir.2000), where the court reversed the convictions of two of the *Trapilo* defendants. The *Trapilo* ruling was further limited by the Second Circuit's opinion in *Attorney General of Canada*, where the court found "the *Boots* reasoning persuasive" in the context of a civil action, and that, as a result, the circuit's earlier reasoning in *Trapilo* was "not controlling here." 268 F.3d at 123–24.

remains an unanswered question of federal law, *id.* at 109, the court nevertheless determined that "sound policy considerations, including international comity, the proper exercise of sovereign powers, institutional competence and separation of powers, and recognition of the U.S.-Canada tax treaty relationship, support the continuing viability and application of the revenue rule to this case," *id.* at 126.

The First and Second Circuit's recitations of the revenue rule, along with the Supreme Court's understanding of the doctrine, are buttressed by the rule's common law history. At least since the eighteenth century, courts have appreciated the broad scope of the rule, which provides that "[o]ne nation does not take notice of the revenue laws of another." *Planche v. Fletcher,* 99 Eng. Rep. 164, 165 (1779). Even more forcefully, in the case of *Holman v. Johnson,* Lord Mansfield recited what he regarded as a firmly established principle, that "no country *ever* takes notice of the revenue laws of another." 98 Eng. Rep. 1120, 1121 (K.B.1775) (emphasis added). The majority disregards this history, explaining that Lord Mansfield's comments are dicta, and that, accordingly, they "cannot serve as a source of binding authority in American jurisprudence." *Ante,* at 329. The majority's argument, however, is unpersuasive, since I cite English common law, not as binding authority, but as persuasive evidence that courts have long since recognized that the revenue rule applies both to the nonenforcement of foreign tax judgments as well as to the nonrecognition of foreign revenue laws.

Notwithstanding this well-established precedent, both from the English and American courts, the majority crafts an exceedingly narrow view of the revenue rule, limiting its application only to those cases in which a United States court is compelled to actually enforce the collection of a foreign tax judgment, and prohibiting its use in any case requiring a United States Court to pass on the validity of, or give effect to, a foreign revenue law. Because this revision creates a circuit split on an issue where such a division is unwarranted, I dissent from the majority's formulation of the revenue rule.

B.

As is evident from the above discussion, the revenue rule is a discretionary doctrine, one that is guided by "constitutional and prudential considerations. . . ." *Boots,* 80 F.3d at 587. *See also Attorney Gen. of Canada,* 268 F.3d at 113 ("We do not suggest that the revenue rule always bars United States courts from furthering the tax policies of foreign sovereigns."); *Trapilo,* 130 F.3d at 550 (recognizing that "our courts will *normally* not enforce foreign tax judgments") (emphasis added); *Boots,* 80 F.3d at 587 (noting that "our courts have traditionally been *reluctant* to enforce foreign revenue laws") (emphasis added); *European Comty. v. R.J.R. Nabisco, Inc.,* 150 F.Supp.2d 456, 476 (E.D.N.Y.2001) ("The revenue rule is discretionary rather than jurisdictional."); *Restatement (Third) of the Law of Foreign Relations,* § 483 (noting that courts are "not required" to apply the rule). As such, we need not apply the doctrine in every criminal prosecution simply because the prosecution may be colored by some aspect of a foreign revenue rule. In the present case, however, the traditional rationales underlying the rule forcefully support its application.

The rationale of the revenue rule, the First Circuit explained:

has been said to be that revenue laws are positive rather than moral law; they directly affect the public order of another country and hence should not be sub-

ject to judicial scrutiny by American courts; and for our courts effectively to pass on such laws raises issues of foreign relations which are assigned to and better handled by the legislative and executive branches of government.

*Boots,* 80 F.3d at 587. Similarly, the Second Circuit recently noted that revenue laws "mirror the moral and social sensibilities of a society. Sales taxes, for example, may enforce political and moral judgments about certain products. Import and export taxes may reflect a country's ideological leanings and the political goals of its commercial relationships with other nations." *Attorney Gen. of Canada,* 268 F.3d at 111. Consistent with the well-articulated explanations from the First and Second Circuits, I believe the revenue rule bars wire fraud prosecutions that are premised upon schemes to violate foreign tax laws because "[n]o court ought to undertake an inquiry which it cannot prosecute without determining whether those [foreign revenue] laws are consonant with its own notions of what is proper." *Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (Hand, J., concurring). That such an intrusive inquiry is required here cannot be denied, as we must determine the validity and application of Canada's tax laws.

The United States, arguing that interpretation of foreign laws is unnecessary, relies on the Second Circuit's decision in *Trapilo,* where the court explained that the wire fraud statute proscribed the "use of the telecommunications systems of the United States in furtherance of a scheme whereby one *intends* to defraud another of property. Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant." 130 F.3d at 552 (emphasis in original). Based on this observation, the *Trapilo* court concluded that the revenue rule would be inapplicable to the government's wire fraud prosecution because "[a]t the

heart of th[e] indictment [was] the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws." *Id.* at 552.

The flaw in the *Trapilo* court's reasoning is transparent. The court recognized the need for evidence of a scheme to defraud another of property, but then erred by simply assuming that the property—Canada's right to tax revenues—existed. *Id.* at 552. The tax revenues would have existed, of course, only if the liquor at issue in *Trapilo* had been subject to the relevant revenue laws. That is, the existence of property necessarily depended upon the court's analysis of Canada's tax laws. The *Trapilo* court, as a matter of logic, actually did inquire into the validity of a foreign sovereign's tax laws, without even realizing that it had done so.

This failing in the *Trapilo* court's reasoning was recognized by the Second Circuit in *United States v. Pierce,* 224 F.3d 158 (2000), where the court stated:

> We did not say or suggest in *Trapilo,* however, that it did not matter whether Canada in fact taxed or levied a duty on liquor sales or imports, or that a guilty mind without something about which to feel guilty was a crime. And while we assumed in *Trapilo* that the government would be able to prove what the indictment alleged, we must on this appeal determine whether the government in fact did so at trial.

*Id.* at 167. The *Pierce* court then reversed the convictions before it, based on the insufficiency of the evidence, explaining:

> A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with.... The Pierces are not accused of scheming to defraud the Canadian

government of its property, but of its *right* to obtain property, its *right* to be paid money. To prove the existence of a scheme to defraud the Canadian government[,] the prosecution had to prove the existence of such a right.

*Id.* at 165 (emphasis in original).

Usually, both the identity of the victim and the success of the scheme are irrelevant to a wire fraud prosecution. *See Trapilo*, 130 F.3d at 552. When the victim is a foreign sovereign, however, these factors take on a new importance. In the present case, to determine whether there was a scheme to defraud another of *property*, this court would have to conclude that Canada's and Ontario's "right to be paid money" had materialized. *Pierce*, 224 F.3d at 165. That is, we would have to find that the defendants had succeeded in their scheme, at least in so far as to actually transport liquor across the Canadian–American border. Stated differently, had the defendants been captured before a single bottle of alcohol crossed into Canada, they could not have been prosecuted under the wire fraud statute because the requisite property would never have come into existence. *See id.* No foreign taxes would be owed.

It is inescapable that in passing on whether defendants intended to violate Canadian law and deprive Canada of its right to taxes and duties owing on actually imported liquor, "our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them." *Boots*, 80 F.3d at 587. The United States, in count one of the underlying indictment, charged, "At all times relevant to the Indictment, the governments of Canada and the Province of Ontario levied excise duties and taxes on the importation and sale of liquor." By alleging the existence of foreign revenue laws, the government effectively conceded that the applicability of Canadian law was central to its case.

The government reasserted the importance of these foreign excises during sentencing. In proposing sentences for the district court to consider, the prosecution turned not to the United States Sentencing Guidelines as one might expect, but rather to *Canadian revenue law*. The government concluded that "Canadian customs duties and excise taxes on a typical case of liquor [totaled] approximately $100 American." Based on its understanding of foreign law, the government then attempted to calculate the amount of tax revenue that would have been paid to foreign sovereigns had the liquor been lawfully imported into Canada. In figuring the tax losses for which David and Carl Pasquantino could be held responsible, the prosecution suggested the figure of $3,589,200.00. In making the same calculation in Arthur Hilts' case, the government arrived at the figure of $1,167,600.00.

The government's—and the court's—reliance on Canadian revenue law at sentencing is particularly revealing. The base offense level for a violation of 18 U.S.C. § 1343, is 6. For defendants with a criminal history category of I, the guideline range for a violation of the federal wire fraud statute is 0–6 months. The sentences received by the defendants, however, were substantially more severe. For each count of conviction, Carl and David Pasquantino were sentenced to 57 months of imprisonment, to be served concurrently, and Arthur Hilts was sentenced to a term of 21 months for his conviction on count one of the indictment. The court arrived at these longer terms of imprisonment by increasing the defendants' offense levels based on the amount of loss to the victim, which in this case was the lost tax revenue to the Canadian and Ontario governments. The Pasquantinos' offense lev-

els were increased by 13 and Arthur Hilts' offense level was increased by 11.[2] Because the bulk of the defendants' sentences were related, not to the American crime of wire fraud, but to the Canadian crime of tax evasion, I conclude that this case was primarily about enforcing Canadian law.

The court's reliance on the government's amount-of-loss computations is deeply troubling for another reason as well—the calculations were not based on any specific knowledge of what the tax liability would have been for the defendants. Instead, the court relied wholly on the testimony of Gina Marie Jonah, an intelligence officer with Canadian Customs. Officer Jonah, who was not offered as an expert witness, testified as to the approximate amount of tax that is generally owed on liquor imported into Canada. She commented, "Alcohol is taxed very high in Canada," but she did not reference any provisions of Canadian law in making this observation. Rather, based on her experience in working at the border, she surmised that on a case of alcohol worth $56 American, Canadian taxes would probably equal $100 American.

The district court never determined whether Officer Jonah's calculations were accurate as a matter of Canadian law. Notwithstanding this uncertainty, the court relied on these calculations to determine the defendants' offense levels under the Sentencing Guidelines. Of course, had it engaged in a more detailed application of foreign tax law, the court could have clarified the ambiguity regarding the amount of loss to the Canadian government. Yet that inquiry would have required precisely

the kind of analysis that the common-law revenue rule seeks to avoid.

### III.

Lastly, it must be noted that applying the revenue rule in this case would not mean that any of the defendants would go unpunished; they have all been indicted in Canada for two breaches of Canadian criminal law: (1) failure to file excise taxes; and (2) possession of unlawfully imported spirits. The Executive should determine whether to extradite the defendants to Canada to face these charges. The Canadian courts could then decide the issue that is at the core of both the American and Canadian prosecutions: whether, and to what extent, the defendants have defrauded the governments of Canada and Ontario out of tax revenues owed pursuant to their own, sovereign, excise laws.

Judge Michael joins in this dissent.

---

**2.** In addition to the 13 and 11–level adjustments mentioned above, each of the defendants received an upward adjustment of 2 levels for a crime that involved more than minimal planning. The Pasquantinos received an additional 4–level increase for their organizing role in the offense. Arthur Hilts received a 3–level decrease for his minimal role in the offense.