PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

BRETT A. BURSEY,
            *Defendant-Appellant.*

───────────────────

DKT LIBERTY PROJECT;
PEOPLE FOR THE AMERICAN WAY;
NATIONAL LAWYERS' GUILD; FIRST
AMENDMENT FOUNDATION;
PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS; PEOPLE'S
LAW OFFICE OF CHICAGO,
            *Amici Supporting Appellant.*

No. 04-4832

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(CR-03-309)

Argued: May 27, 2005

Decided: July 25, 2005

Before MOTZ and KING, Circuit Judges,
and Eugene E. SILER, Jr., Senior Circuit Judge of the
United States Court of Appeals for the Sixth Circuit,
sitting by designation.

───────────────────

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Motz and Senior Judge Siler joined.

## COUNSEL

**ARGUED:** Jeffrey E. Fogel, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York; P. Lewis Pitts, Jr., ADVOCATES FOR CHILDREN'S SERVICES, Durham, North Carolina, for Appellant. Christopher Todd Hagins, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, for Appellee. Susan R. Podolsky, Julie M. Carpenter, JENNER & BLOCK, Washington, D.C., for Amici Curiae Supporting Appellant.

## OPINION

KING, Circuit Judge:

Appellant Brett Bursey was convicted in early 2004 — after a bench trial conducted by a magistrate judge in the District of South Carolina — of willfully and knowingly entering and remaining in a posted, cordoned off, or otherwise restricted area where the President was temporarily visiting, in contravention of § 1752(a)(1)(ii) of Title 18 of the United States Code. *See United States v. Bursey*, No. 3:03-309 (D.S.C. Jan. 6, 2004) (the "Verdict"). Bursey's conviction was thereafter affirmed by the district court, and he has now appealed to this Court. *See United States v. Bursey*, No. CR-03-309 (D.S.C. Sept. 14, 2004) (the "Opinion"). Bursey advances two contentions on appeal: first, he maintains that the trial court erred in finding that he was in a "restricted area" at the time of his October 2002 arrest; second, he contends that the court erred in finding that he possessed the requisite criminal intent. As explained below, we reject both of Bursey's challenges and affirm.

I.

A.

These proceedings arise from a presidential visit to Columbia, South Carolina, on October 24, 2002, for a political rally held at the

Columbia airport's Doolittle Hangar. *See* Verdict at 1.[1] In advance of the President's trip, the Secret Service designated an area near the hangar as a restricted area. *See id.* at 12. The restricted area extended approximately 100 yards on each side of the hangar along Airport Boulevard and approximately one-half mile from the hangar toward Highway 302. *See id.* at 6.

On the day of the political rally, law enforcement officers were stationed at the perimeter of the restricted area and were patrolling inside of it, although its boundaries were not marked by physical barriers or signs. Verdict at 6-7. The restrictions were in effect from approximately 7:30 a.m. until the President's departure following the rally. *See id.* at 3. Vehicles and pedestrians were permitted to travel through the restricted area until shortly before the President's noon arrival, in order to accommodate commerce and to permit airport access. *See id.* at 7, 12. Vehicles were not, however, allowed to stop or remain in the area. *Id.* at 3. Pedestrians were only permitted to remain in the restricted area if they waited in line to enter Doolittle Hangar, where they were required to present tickets for the rally and pass through a security checkpoint. *See id.* Because the Republican Party of South Carolina, the rally's sponsor, had distributed approximately 7000 tickets for the presidential event, numerous persons waited in line.

After the President's plane had landed but before he arrived at Doolittle Hangar, the restricted area was "shut down," *i.e.*, it was cleared of all vehicles and pedestrians, including ticket holders awaiting entrance to the hangar. *See* Verdict at 7, 12. Thereafter, only authorized persons, such as presidential staff, military, and law enforcement officers (all of whom wore lapel pins issued by the Secret Service), could remain in the restricted area.

## B.

Prior to the President's arrival, Bursey drove to the airport, intend-

---

[1]We recite the facts in the light most favorable to the Government, as the prevailing party. *See United States v. Pasquantino*, 336 F.3d 321, 332 (4th Cir. 2003) (en banc). The Magistrate Judge made findings of fact in the Verdict, which we review for clear error. *See* Fed. R. Civ. P. 52(a).

ing to protest the war in Iraq.**²** After parking his car, Bursey walked to a grassy area near the hangar (within the restricted area), at the southeastern corner of Airport Boulevard and Lexington Drive, carrying anti-war signs and a megaphone. *See* Verdict at 4. A Secret Service Agent, Holly Abel, and a state law enforcement officer, Tamara Baker, then approached Bursey and informed him that he could not remain in the restricted area. *See id.* After some discussion, Bursey crossed diagonally to the northwestern corner of the same intersection, remaining in the restricted area. *Id.*

Law enforcement officers thereafter advised Bursey that the northwestern corner of the intersection was also restricted. *See* Verdict at 4. Moreover, Agent Abel advised Bursey that he had certain choices: (1) go home; (2) get in line if he had a ticket; (3) go to the designated demonstration area; or (4) suffer the consequences and be arrested. The officers also advised Bursey to leave the area, as he was trespassing. *See id.* at 12. Bursey, who thirty years earlier had participated in a peaceful demonstration at the same airport against President Nixon's policies in Vietnam, knew that the Supreme Court of South Carolina had thrown out trespass charges arising from that demonstration, holding that the airport was public property and that the relevant South Carolina trespass statute was inapplicable. *See South Carolina v. Hanapole*, 178 S.E.2d 247 (S.C. 1970). As a result, Bursey declined to leave the restricted area. *See* Verdict at 4, 12.

The entire confrontation between Bursey and the officers lasted twenty to twenty-five minutes. During much of that period, other individuals were in the restricted area, many of them in line to enter Doolittle Hangar. When the officers gave Bursey a final ultimatum to depart, however, the restricted area had been shut down, and the general public (including those waiting in line) had been cleared. At that point, when Bursey refused to leave, he was arrested by airport police on a state trespass charge. That charge was later dismissed because, as Bursey had believed, the property was public and not subject to the South Carolina trespass statute.

---

**²**Bursey had previously called the South Carolina Law Enforcement Division to advise it of his intention to protest. There is some dispute, irrelevant to this appeal, as to what was said during and following that conversation.

C.

Over four months after his arrest, on March 7, 2003, Bursey was charged by the United States Attorney in a one-count information with violating § 1752(a)(1)(ii) of Title 18 (the "Statute").[3] On November 12 and 13, 2003, he was tried by the Magistrate Judge in a two-day bench trial. *See* 18 U.S.C. § 3401 (providing magistrate judge with trial jurisdiction under certain circumstances). By the Verdict filed on January 6, 2004, Bursey was convicted and sentenced to a $500 fine and a $10 special assessment. *See* Verdict at 13. On January 13, 2004, he appealed to the district court, which received briefs and conducted a September 1, 2004 hearing. *See* 18 U.S.C. § 3402 (providing appeal of right to district court from conviction by magistrate judge). On September 14, 2004, the district court issued its Opinion, affirming Bursey's conviction and sentence. *See* Opinion at 20. Bursey has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

An appellate review conducted by a district court after a bench trial before a magistrate judge is not a trial de novo; rather, the district court utilizes the same standards of review applied by a court of appeals in assessing a district court conviction. *See* Fed. R. Crim. P. 58(g)(2)(D). And our review of a magistrate court's trial record is governed by the same standards as was the district court's appellate review. *See United States v. Hughes*, 542 F.2d 246, 248 (5th Cir. 1976). We assess challenges to the sufficiency of the evidence by viewing it — including all reasonable inferences to be drawn therefrom — in the light most favorable to the Government. *See United*

---

[3]The Information alleged that, on October 24, 2002, Bursey:

> knowingly and willfully did enter and remain in and on grounds located at or near Airport Boulevard and Lexington Avenue, West Columbia, South Carolina, which was then a posted, cordoned off and restricted area where the President of the United States was temporarily visiting, in violation of the regulations governing ingress and egress thereto;

All in violation of Title 18, United States Code, Section 1752(a)(1)(ii).

*States v. Pasquantino*, 336 F.3d 321, 332 (4th Cir. 2003) (en banc). Findings of fact made by the trial court are reviewed for clear error, and issues of law (such as the interpretation of statutes and regulations) are reviewed de novo. *See United States v. Leftenant*, 341 F.3d 338, 342-43 (4th Cir. 2003).

## III.

Bursey raises two contentions in this appeal. First, he asserts that the trial court erred in concluding that he was in a restricted area at the time of his arrest. In challenging this conclusion, Bursey contends that the area was not restricted within the meaning of the Statute and its governing regulations. Second, he maintains that the trial court erred in concluding that he possessed the requisite criminal intent to commit the offense charged. We address these contentions in turn.[4]

## A.

In relevant part, the Statute provides that it is unlawful for any person to willfully and knowingly "enter or remain in any posted, cordoned off, or otherwise restricted area of . . . grounds where the President . . . is or will be temporarily visiting, in violation of the regulations governing ingress or egress thereto." 18 U.S.C. § 1752(a)(1)(ii).[5] As directed by Congress, the Secretary of the Trea-

---

[4]Bursey asserted before the Magistrate Judge that the Government's prosecution was conducted in an unconstitutional manner, *i.e.*, that he was the victim of an unconstitutional selective prosecution. *See* Verdict at 5-12. Bursey abandoned that claim on appeal to the district court and has not raised it in this proceeding. Opinion at 2 & n.1. Although the constitutional propriety of this prosecution is not before us, whether Bursey should have been prosecuted is — as a general proposition — a decision reserved to the executive branch, specifically the Attorney General and the United States Attorney. And, while such decisions may be fair game for public criticism, they normally are not subject to judicial review. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[T]he decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.").

[5]The Statute was enacted in 1971, following the assassinations of President John F. Kennedy and his brother, presidential candidate Robert F. Kennedy.

sury has promulgated regulations pursuant to the Statute, providing, in part, that "ingress or egress to or from . . . any posted, cordoned off, or otherwise restricted areas of . . . grounds where the President . . . is or will be visiting is authorized only for the following persons:" invitees, members of the President's family and staff, military and communications personnel, law enforcement personnel, and holders of easements to the property. 31 C.F.R. § 408.3(a) (the "Regulations").[6] In reviewing Bursey's contention, we first assess his position with respect to what constitutes a "restricted area" under the Statute. We then turn to his challenge concerning the Regulations.

1.

Bursey maintains that the area where he was arrested was not restricted within the meaning of the Statute, because there was no physical manifestation of the area's boundaries. He contends that the Statute's terms — "any posted, cordoned off, or otherwise restricted area" — require that such an area's boundaries must be physically demarcated. In so maintaining, he relies upon the statutory construction principles of *noscitur a sociis* ("[i]t is known from its associates")

---

[6]Specifically, the Regulations provide that only the following persons are authorized to be within a restricted area:

(1) Invitees: Persons invited by or having appointments with the protectee, the protectee's family, or members of the protectee's staff;

(2) Members of the protectee's family and staff;

(3) Military and Communications Personnel assigned to the Office of the President;

(4) Federal, State, and local law enforcement personnel engaged in the performance of their official duties and other persons, whose presence is necessary to provide services or protection for the premises or persons therein;

(5) Holders of grants of easement to the property, provided such persons or their authorized representatives show title to the grant of easement and obtain authorization from the United States Secret Service.

31 C.F.R. § 408.3(a).

and *ejusdem generis* ("[o]f the same kind, class, or nature"). *Black's Law Dictionary* 608, 1209 (4th ed. 1968). Under these canons of construction, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship of Danny Keffeler*, 537 U.S. 371, 384 (2003) (internal quotations marks and alterations omitted). Applying these canons to the Statute, Bursey asserts that the term "otherwise restricted" must be construed to embrace only physical indicia of a restricted area's boundaries, much like the terms "posted" and "cordoned off." He also contends that, at the time of his arrest, there was no physical manifestation of the restricted area's boundaries, and that he thus did not violate the Statute.

We need not determine whether, as Bursey contends, the Statute requires a physical demarcation of a restricted area. This is because, contrary to Bursey's assertions of fact, the boundaries of this restricted area were visibly marked. Indeed, the Magistrate Judge specifically found that the "law enforcement agents were stationed at the perimeters of the area." Verdict at 7. Stationing agents along an area's perimeter squarely falls within the plain meaning of the term "cordoned off," that is, "a line or series of troops or of military posts placed at intervals and enclosing an area to prevent passage" or "a barrier of any kind operating to close off, restrict, or control access." *Webster's Third New International Dictionary* 506 (1976). Pursuant thereto, the officers at the perimeters of the area were sufficient to make it a "cordoned off" and otherwise restricted area. As a result, there was no error in the trial court's ruling that the area surrounding Doolittle Hangar, in which Bursey was arrested, was a restricted area within the meaning of the Statute.[7]

---

[7]In his appeal, Bursey makes no contention that the Magistrate Judge's finding that law enforcement officers were stationed at the perimeters of the restricted area is clearly erroneous, or that the finding is otherwise insufficient to render the area "cordoned off" or otherwise restricted under the Statute. We thus need not address the contention of the amicus curiae that the Opinion, by not mandating visible markers of the restricted area's boundary, presents First Amendment problems.

## 2.

Bursey next contends that the trial court erred in concluding that the area was restricted within the meaning of the Regulations. *See* Verdict at 4. Specifically, he maintains that, because persons with and without tickets could freely enter and traverse the restricted area, and could wait in line to enter Doolittle Hangar, the area was not restricted pursuant to the Regulations, which limit access to persons such as presidential invitees, family members, and staff.

Bursey's contention on this point is also without merit, because the area was restricted to all but authorized persons, as provided for in the Regulations, at the time of his arrest. Although there was conflicting testimony on this point, the evidence must be viewed in the light most favorable to the Government, and we can only vacate factual findings that are clearly erroneous. *See Leftenant*, 341 F.3d at 342-43; *Pasquantino*, 336 F.3d at 332. The Magistrate Judge found that once Air Force One had landed, "all vehicular traffic through the area was halted," and, once the President had departed the plane, the area was "cleared even of ticket holders waiting to get into the building." Verdict at 3. Although no specific finding was made on the precise time of Bursey's arrest in relation to the time of the shut down, we are obliged — in properly viewing the evidence — to agree with the district court that "at the time of his arrest, the area had, in fact, been shut down." Opinion at 16 (emphasis omitted). On this point, Agent Abel testified that she advised Bursey, prior to his arrest, "[l]ook around you, there is nobody else here . . . . Don't you understand, it's completely closed off now . . . ." *Id.* at 16 n.26. Agent Baker also testified that, at the time of Bursey's arrest, "the ticketholders had actually been moved out of the area" and "when the President is coming in . . . you can't have anybody . . . where they can see him." *Id.* (alterations omitted). In these circumstances, the trial court did not err in determining that the area was restricted pursuant to the Regulations.

## B.

Finally, Bursey maintains that the trial court erred in finding that he had "willfully and knowingly" committed the offense charged. *See* Verdict at 4. Although Bursey concedes that he was advised by the officers before his arrest that he was in a restricted area and required

to leave, he contends that he was never advised that the area was a federally restricted zone, so designated by the Secret Service. He further asserts that the instructions given to him by the officers were insufficient to supply the necessary knowledge that his conduct was unlawful under the Statute.

Although "[d]ivining the meaning of 'willfully' in criminal statutory *mens rea* terms has long bedeviled American courts," our assessment of whether, under this evidence, Bursey willfully violated the Statute does not present a close question. *United States v. George*, 386 F.3d 383, 389 (2d Cir. 2004) (emphasis in original).[8] Bursey need not have known of the Statute itself (nor, for that matter, the Regulations) in order to possess the requisite intent to violate it. *See Bryan v. United States*, 524 U.S. 184, 196 (1998) (holding, in context of firearms statute, 18 U.S.C. § 922(a)(1)(D), that knowledge of conduct's general unlawfulness, rather than knowledge of particular criminal statute and regulations, is only requirement for willful violation).[9] As

---

[8]We focus our discussion on whether Bursey "willfully" violated the Statute, because, generally, "[m]ore is required" with respect to conduct performed willfully than conduct performed knowingly. *Bryan v. United States*, 524 U.S. 184, 193 (1998); *see also United States v. Jarvouhey*, 117 F.3d 440, 442 (9th Cir. 1997) (concluding willful violation of 18 U.S.C. § 924(a) requires "more culpable" mens rea than knowing violation). As a general proposition, the statutory term "knowingly" requires the Government to prove only that the defendant had knowledge of the facts underlying the offense. *See Bryan*, 524 U.S. at 192-93.

[9]In *Bryan*, the Court acknowledged that it had held to the contrary in a line of decisions addressing currency and taxation statutes — that is, that the term "willfully" in a criminal statute required that the defendant possess knowledge of the particular law that he was charged with violating. 524 U.S. at 194 (citing *Ratzlaf v. United States* 510 U.S. 135 (1994); *Cheek v. United States*, 498 U.S. 192 (1991)). As in *Bryan*, the *Ratzlaf* and *Cheek* line of decisions are inapposite to these circumstances, where the Statute is not technical like the currency and taxation laws and the danger of an innocent state of mind is diminished. *Id.* at 194-95 & n.22 (observing that in *Ratzlaf* and *Cheek*, "'both sets of laws are technical; and both sets of laws sometimes criminalize conduct that would not strike an ordinary citizen as immoral or likely unlawful'") (quoting *United States v. Aversa*, 984 F.2d 493, 503 (1st Cir. 1993) (Breyer, C.J., concurring)).

the *Bryan* Court observed, for a defendant to have acted willfully, he must merely have "acted with knowledge that his conduct was unlawful." *Id.* at 193. Thus, Bursey need not have had knowledge of the existence of the Statute — or its federal nature — in order to have willfully violated it.

The Statute required only that Bursey refrain from "willfully and knowingly . . . enter[ing] or remain[ing] in any posted, cordoned off, or otherwise restricted area of . . . grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(a)(1)(ii). Bursey plainly intended to enter and remain near Doolittle Hangar, which was a restricted area. He concedes that he knew that the President was visiting the area, that the area was deemed restricted by law enforcement, and that he had been ordered to leave. Furthermore, contrary to Bursey's position on appeal, the district court found that he understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement). Opinion at 17-18. To the extent that Bursey challenges that finding, we again view the evidence (and any reasonable inferences drawn therefrom) in the light most favorable to the Government. *See Pasquantino*, 336 F.3d at 332. In so doing, there was ample evidence that Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone. Specifically, Bursey testified that he believed that "at that event, October, when the President came to town, that the circumstances would be similar to his prior visits, where . . . the Secret Service comes in and preempts" local and state police. Opinion at 17 n.27. Bursey also acknowledged that, in protesting at two earlier visits to South Carolina by the incumbent President, he was advised in both instances that "the Secret Service had basically preempted the security arrangements" of local police. *Id.* Bursey thus took a calculated risk when he defied the orders of the officers to leave the restricted area, thereby intending to act unlawfully. As a result, the trial court's determination that Bursey possessed the requisite intent to commit the offense charged was not clearly erroneous.

## IV.

Pursuant to the foregoing, we affirm Bursey's conviction and sentence.

*AFFIRMED*