**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 19-4464**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REBECCA A. MORIELLO,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:18-cr-00187-MR-1)

Argued:  September 10, 2020                                  Decided:  November 18, 2020

Before MOTZ, KING, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Floyd wrote the opinion in which Judge Motz and Judge King joined.

**ARGUED:**  William Robinson Heroy, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE PLLC, Charlotte, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:**  William T. Stetzer, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

FLOYD, Circuit Judge:

Appellant Beckie Moriello challenges her conviction under two administrative regulations for repeatedly refusing to comply with directions from an immigration judge and a courtroom bailiff to cease distracting conduct during an immigration proceeding. Moriello argues that the regulations are unconstitutionally vague, violate the nondelegation doctrine, and run afoul of the Tenth Amendment. She also challenges the district court's interpretation of the regulations and the sufficiency of the evidence supporting her conviction. We reject each of Moriello's challenges and conclude that the regulations are constitutional, the district court properly interpreted the regulations, and sufficient evidence supports Moriello's conviction.

I.

A.

Moriello works as an immigration attorney in Charlotte, North Carolina. On June 29, 2017, she appeared for a hearing on behalf of a client at the Charlotte Immigration Court. The Charlotte Immigration Court is a federal facility of the Executive Office of Immigration Review (EOIR) on property managed by the General Services Administration (GSA). A placard displayed near the entrance notifies visitors that federal regulations govern the facility.

Two such regulations are relevant here. The first, 41 C.F.R. § 102-74.385 (the "Direction Regulation"), requires "[p]ersons in and on [the] property . . . [to] comply with official signs of a prohibitory, regulatory or directory nature and with the lawful direction

of Federal police officers and other authorized individuals." The second, 41 C.F.R. § 102-74.390 (the "Conduct Regulation"), prohibits "[a]ll persons entering in or on Federal property . . . from loitering, exhibiting disorderly conduct[,] or exhibiting other conduct on property that . . . [o]therwise impedes or disrupts the performance of official duties by Government employees."

Following the hearing on behalf of her own client, Moriello observed an unrelated asylum hearing over which Immigration Judge Barry J. Pettinato presided. Although the proceedings were closed, Moriello obtained permission to observe from the asylum-seeker's attorney and sat in the courtroom gallery. A sign outside the courtroom stated: "Persons in EOIR space must turn off their electronic devices (e.g., smartphone, laptop). For clear and immediate business purposes only, attorneys and other representatives are exempt from this rule . . . ." J.A. 327.

Protective Security Officer (PSO) Pinar Bridges was on duty as the uniformed bailiff in the courtroom. PSOs at EOIR are independent contractors supervised by the Federal Protective Service (FPS). Agent Frank Skrtic, an FPS special agent investigator, testified at Moriello's bench trial that PSOs "have the power to detain" people, "conduct administrative searches, put people on notice," "enforce the Federal Management Regulations" at the facility, and otherwise carry out all the functions of FPS officers other than "mak[ing] a full blown arrest." J.A. 168–69. During the proceeding, PSO Bridges saw Moriello typing on her phone in the courtroom. PSO Bridges knew that Moriello was not representing anyone in the proceeding, so she assumed that Moriello had no immediate business inside the courtroom. When PSO Bridges asked Moriello to turn off her phone,

3

Moriello responded that it was "her right" to use the phone for business purposes and refused to turn off the phone. J.A. 196. PSO Bridges returned to her normal location next to Judge Pettinato.

Though unaware of Moriello's initial exchange with PSO Bridges, Judge Pettinato also noticed Moriello typing on her phone. He saw that Moriello held her phone at chest-level, easily visible to others in the courtroom. Judge Pettinato testified:

> Ms. Moriello had specifically asked for permission to come into a private confidential asylum hearing which is very rarely allowed. And I assumed it was so that she could learn something from it. The entire time that Ms. Moriello was sitting in my courtroom I did not see her paying attention to what was going on with the attorney or with the witness. She was pretty much non-stop glued to her cell phone and she was texting away, and I found it to be very distracting. I also found it to be very disrespectful given that she had asked for permission to sit in on this very sensitive matter, and she was not paying attention.

J.A. 216–17. Judge Pettinato went off the record to direct PSO Bridges to tell Moriello to stop using her phone.[1] After Judge Pettinato resumed the asylum hearing, PSO Bridges again approached Moriello to ask her to comply with the Judge's instruction to stop using her phone.

Moriello again refused. She "became argumentative," telling PSO Bridges that she was using her phone for business purposes and that she can "do whatever she wants." J.A. 407. Judge Pettinato observed PSO Bridges speaking with Moriello for "some considerable period of time." J.A. 218. At some point, Judge Pettinato saw Moriello stand

---

[1] According to Judge Pettinato, going off the record is "just a little click on [his] mouse on the computer to turn the digital recording equipment on and off." J.A. 216.

4

and move to the back of the courtroom as PSO Bridges continued to try to get her to either stop using her phone or leave the courtroom. Though their conversation was not loud, Judge Pettinato found the exchange to be "very disruptive visually." *Id*. PSO Bridges requested help from a second PSO. The two PSOs together were unable to convince Moriello to either stop using her phone or leave—all while the immigration proceedings remained ongoing. PSO Bridges then called the Charlotte-Mecklenburg Police Department (CMPD).

Judge Pettinato eventually called for a recess in the hearing "because [he] could see that it had escalated into a more serious situation." J.A. 219. During the recess, Moriello remained in the courtroom and continued using her phone. The CMPD officers responded to PSO Bridges's call during the recess. They conveyed Judge Pettinato's direction to stop using her phone, and PSO Bridges also repeated the instruction. Moriello again refused. The CMPD officers then escorted Moriello out of the courtroom and spoke with her about leaving the premises. According to PSO Bridges, Moriello told the CMPD officers "that the Judge cannot tell her what to do. That's her right. She can be on the phone. It's business purposes only." J.A. 198. Two FPS officers arrived and one of them wrote Moriello a citation for violating the Direction Regulation.

B.

Shortly after Moriello's case was filed in the Western District of North Carolina, the government offered to settle the charge with no admission of guilt and a civil fine—at one point as little as $300. Moriello rejected the offer and requested a criminal trial.

5

Moriello moved to dismiss the citation, alleging charging deficiencies. The government subsequently filed a superseding two-count bill of information. Count One charged Moriello with failing to comply with the lawful direction of an authorized individual while on property under the authority of the GSA in violation of the Direction Regulation. *See* 41 C.F.R. § 102-74.385. Count Two charged Moriello with impeding and disrupting the performance of official duties by government employees while on property under the authority of the GSA in violation of the Conduct Regulation. *See* 41 C.F.R. § 102-74.390. Both offenses are Class C misdemeanors and are therefore petty offenses subject to a maximum term of imprisonment of 30 days and a maximum fine of $5,000. *See* 18 U.S.C. §§ 19, 3571(b)(6), 3559(a)(8); 41 C.F.R. § 102-74.450.

Moriello's case was assigned to a magistrate judge. Moriello filed two motions to dismiss. Her first motion argued that the regulations were unconstitutionally vague and violated the separation of powers doctrine. Her second motion argued that the two counts were multiplicitous under the Double Jeopardy Clause of the Fifth Amendment. The magistrate judge denied both motions and thereafter presided over Moriello's bench trial. At the conclusion of the trial, the magistrate judge found Moriello guilty on both counts and ordered her to pay a fine of $2,500.

On appeal to the district court, Moriello argued as follows: (1) PSO Bridges's and Judge Pettinato's orders were not lawful under the Direction Regulation; (2) Moriello's conduct was not disruptive under the Conduct Regulation; (3) neither PSO Bridges nor Judge Pettinato met the definition of an "authorized individual" under the Direction Regulation or a "Government employee" under the Conduct Regulation; (4) both

6

regulations were promulgated pursuant to unconstitutional delegations of authority under the nondelegation doctrine and the Tenth Amendment; and (5) both regulations were unconstitutionally vague.

The district court affirmed the magistrate judge's decision, holding that the regulations were constitutional and sufficient evidence supported her conviction. Moriello timely appealed to this Court.

## II.

We review a trial court's findings of fact for clear error, and findings of law de novo. *See United States v. Bursey*, 416 F.3d 301, 306 (4th Cir. 2005). For questions of law such as the "construction of an administrative regulation, we review the district court's ruling de novo." *Radford v. Colvin*, 734 F.3d 288, 293 (4th Cir. 2013).

When considering a challenge to the sufficiency of the evidence to support a conviction, this Court is "obliged to sustain a guilty verdict if, viewing the evidence in the light most favorable to the Government, it is supported by 'substantial evidence.'" *United States v. Allere*, 430 F.3d 681, 692 (4th Cir. 2005) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 862. The same standard applies when the defendant is convicted of a petty offense after a bench trial. *See United States v. Anglin*, 438 F.3d 1229, 1231 (10th Cir. 2006); *United States v. Burrell*, No. 92-5223, 1993 WL 73705, at *2 (4th Cir. Mar. 17, 1993) (per curiam).

III.

Moriello's appeal presents five questions: (1) whether the regulations are unconstitutionally vague; (2) whether the regulations violate the nondelegation doctrine; (3) whether the regulations violate the Tenth Amendment; (4) whether the district court properly interpreted the regulations; and (5) whether sufficient evidence supports Moriello's conviction. We consider each in turn.

A.

We first address Moriello's argument that both regulations are unconstitutionally vague. Under the vagueness doctrine, a criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Doe v. Cooper*, 842 F.3d 833, 843 (4th Cir. 2016) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Thus, in cases not implicating the First Amendment, "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982); *see also United States v. Baldwin*, 745 F.3d 1027, 1031–32 (10th Cir. 2014) (Gorsuch, J.) ("The Supreme Court has told us (repeatedly) that the relevant question in void for vagueness challenges is merely whether the defendant

before us 'had fair notice from the language' of the law 'that the particular conduct which he engaged in was punishable.'" (quoting *Parker v. Levy*, 417 U.S. 733, 755 (1974))).

Here, because Moriello does not bring a First Amendment challenge, our review is limited to whether Moriello had fair notice that the regulations proscribed her conduct. Moriello argues that neither regulation defines which individuals at the court facility an ordinary citizen must obey and under what circumstances. Yet any person of ordinary intelligence would understand that the regulations prohibit the repeated refusal to cease distracting conduct in a courtroom during ongoing immigration proceedings as directed by both the presiding immigration judge and the uniformed bailiff assigned to that courtroom. Indeed, Moriello's behavior was so disruptive as to prompt Judge Pettinato to call a recess and PSO Bridges to seek assistance from one additional PSO and two additional CMPD officers to remove Moriello from the courtroom.

Moriello attempts to take us beyond the facts of her own case, citing extensively to facial vagueness and overbreadth precedent in the First Amendment context. As noted, Moriello does not bring a First Amendment challenge. Her facial attacks are therefore inappropriate. The parties' focus on *United States v. Cassiagnol*, 420 F.2d 868 (4th Cir. 1970), in the context of a facial vagueness challenge is similarly misplaced. *Cassiagnol* is useful only as an example of the relevant fact-bound inquiry in as-applied vagueness challenges. In *Cassiagnol*, this Court concluded that the predecessor regulation to the Conduct Regulation was not vague as applied to the defendant because it clearly prohibited the conduct in which he engaged. *See id.* at 873–74 ("It would not require a high degree of intelligence . . . for one to reasonably conclude that breaking through a line of United

9

States marshals . . . [or] remaining on government property which was closed to the public . . . could subject him to charges . . . ."). *Cassiagnol*'s subsequent analysis of whether the predecessor regulation was facially vague or overbroad under the First Amendment is irrelevant for our purposes. *See Vill. of Hoffman Ests.*, 455 U.S. at 495.

Accordingly, the district court properly rejected Moriello's vagueness challenge.

B.

Next, we consider Moriello's argument that the regulations violate the nondelegation doctrine. "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). In determining "whether Congress has supplied an intelligible principle," courts must first "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides," and then "decide whether the law sufficiently guides executive discretion." *Id.* The Supreme Court has suggested that more specific guidance *may* be required when Congress delegates authority to enact criminal rules. *See Touby v. United States*, 500 U.S. 160, 165–66 (1991) (acknowledging that "[o]ur cases are not entirely clear as to whether more specific guidance is in fact required" when Congress is delegating authority "to promulgate regulations that contemplate criminal sanctions").

The regulations at issue here were promulgated pursuant to 40 U.S.C. § 1315 (formerly found at 40 U.S.C. § 318a (2002)). Congress delegated authority to the Secretary of Homeland Security in consultation with the Administrator of General Services to promulgate "regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property," including "reasonable penalties" of "not more than 30 days" in prison and fines in the amounts allowed by Title 18. 40 U.S.C. § 1315(c).

We have already decided that § 1315's predecessor statute, § 318a, is a constitutional delegation of authority. *See Cassiagnol*, 420 F.2d at 876; *United States v. Crowthers*, 456 F.2d 1074, 1077 (4th Cir. 1972) (citing *Cassiagnol*, 420 F.2d at 875–77) (rejecting a nondelegation doctrine challenge to § 318a because "[i]t has been settled otherwise in this circuit"). In *Cassiagnol*, we concluded that the predecessor to § 1315 was constitutional because "[i]t is reasonable and constitutional to delegate to the agency charged with maintenance and protection of government property the right to fix . . . minimum acceptable conduct thereon, and to provide for the punishment of those violating such regulations." 420 F.2d at 876–77. We recognized that "[s]uch authority necessarily had to be somewhat general in nature due to the vast number and great variety of properties entrusted to the charge and control of GSA," and that "[t]o require Congress specifically to enumerate GSA's duties would be to require the impractical, if not the impossible." *Id.* at 876. Yet, "this authority, contrary to appellants' contention, was not unlimited"—rather, the statute limited the GSA's power to "mak[ing] 'needful rules and regulations' to

11

maintain and protect such property and ensure its use for the authorized purpose." *Id.* (quoting 40 U.S.C. § 318a (2002)). *Cassiagnol* is decisive here.

Moreover, the modern iteration of the delegating authority, § 1315, provides an even narrower delegation than § 318a. Whereas § 318a delegated the authority to "make all needful rules and regulations for the government of the property under [its] charge and control," 40 U.S.C. § 318a (2002), § 1315 specifies that the rules must be "for the protection and administration of property owned or occupied by the Federal Government and persons on the property," 40 U.S.C. § 1315(c). Even assuming a higher standard exists for regulations imposing criminal penalties, this is clearly a permissible delegation by Congress in light of our precedent.

Moriello argues that the regulations nevertheless exceed the scope of the authority delegated by § 1315 in two distinct ways. First, she contends that the regulations impermissibly bestow contempt authority on immigration judges when such authority should be bestowed directly by Congress or promulgated under the code provisions relating to the authority of immigration judges. Yet, as we explained in *Cassiagnol*, the delegating statute was meant to "ensure [the] use [of federal property] for the authorized purpose." 420 F.2d at 876. The regulations provide immigration judges the authority to ensure that their courtrooms are used for the authorized purpose of conducting immigration proceedings. Second, Moriello claims that the regulations' provision of criminal sanctions is inconsistent with their stated purpose of maintaining federal property. Not so. Section 1315 expressly delegates the authority to impose criminal sanctions for the protection and

12

administration of federal property and persons on federal property. *See* 40 U.S.C. § 1315(c)(1).

The district court properly concluded that § 1315 is a constitutional delegation of authority and that the regulations do not exceed the scope of that authority.

C.

Next, we consider Moriello's argument that the regulations violate the Tenth Amendment. "[P]owers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Constitution delegates to Congress the "[p]ower to . . . make all needful Rules and Regulations respecting the . . . [p]roperty belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. It also delegates the power to "make all [l]aws which shall be necessary and proper for carrying into [e]xecution" the "[p]owers" it vests "in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

Moriello summarily asserts that "[t]he challenged regulations interfere with [her] rights as a private citizen to disregard unwarranted exercise of authority." Opening Br. at 36. The regulations here control the conduct of persons on federal property. These regulations are firmly within the federal government's power to make such laws as are necessary and proper to regulate "[p]roperty belonging to the United States." U.S. Const. art. IV, § 3, cl. 2; *see also* U.S. Const. art. I, § 8, cl. 18; *Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045, 1049 (2d Cir. 1988) (concluding that the "GSA's clearly established

13

authority to maintain, operate, and alter federal buildings" stems from "Congress' power under the Constitution 'to dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States.'" (quoting U.S. Const. art. IV, § 3, cl. 2)).

The district court properly concluded that the regulations do not violate the Tenth Amendment.

D.

Next, we consider Moriello's argument that her conviction under Count One was improper because the district court misinterpreted the regulations.[2]  As the district court explained, conviction under the Direction Regulation requires the government to prove three elements: "(1) that the Defendant was on property under authority of the GSA; (2) that the Defendant knowingly failed to comply with the direction of a Federal police officer or other authorized individual; and (3) that the direction with which the Defendant failed to comply was lawful."  J.A. 413–14; *see also* 41 C.F.R. § 102-74.385.  Moriello argues that there was no "lawful" direction provided by an "authorized individual."  *See* 41 C.F.R. § 102-74.385.

Regulatory interpretation is a question of law.  *See Bursey*, 416 F.3d at 306.  This Court construes a regulation using the same rules applicable to statutory construction.  *See*

---

[2] As the district court noted, Moriello improperly characterizes her challenges to Count One as sufficiency-of-the-evidence arguments.  We analyze them properly as questions of law.

*Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 962 (4th Cir. 2015). If the language of the regulation "has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (quoting *Textron Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003)). If the language is ambiguous, "the intent of Congress or the Agency concerning the disputed language must be resolved through application of various settled rules of construction and interpretation, including analysis of the underlying statute's structure and purpose." *Am. Alt. Ins. Co. v. Sentry Select Ins. Co.*, 176 F. Supp. 2d 550, 554–55 (E.D. Va. 2001) (citing *United States v. Jackson*, 759 F.2d 342, 344 (4th Cir. 1985)).

First, Moriello asserts that only federal law enforcement personnel—not PSOs or immigration judges—qualify as "authorized individuals" under the Direction Regulation. Chapter 102 of the Code of Federal Regulations does not define the term "authorized individual." *See generally* 41 C.F.R. § 102. The plain meaning of "authorize," when used with a direct object that is "a person or agent," means "[t]o give . . . legal or formal authority (*to* do something)." *Authorize*, Oxford English Dictionary (3d ed. 2014) (emphasis in original). The Direction Regulation specifies that the relevant "something" is issuing a "lawful direction." 41 C.F.R. § 102-74.385.

Immigration judges have the legal and formal authority to issue lawful directions during proceedings over which they preside. Immigration judges are legally authorized to "conduct . . . proceedings," "exercise their independent judgment and discretion," and "take any action consistent with their authorities under the [Immigration and Nationality Act] and regulations that is appropriate and necessary for the disposition of such cases." 8

15

C.F.R. § 1003.10(a)–(b). As the Eleventh Circuit recently noted, "an Immigration Judge's role in immigration proceedings" is "'functionally comparable' to that of a judge." *Stevens v. Osuna*, 877 F.3d 1293, 1302 (11th Cir. 2017). Immigration judges thus have "an obligation to maintain control over the courthouse and over the conduct of persons in the courthouse." *Id.* at 1305.

Moriello argues that immigration judges cannot be "authorized individuals" because their authority arises from immigration statutes and regulations, rather than GSA regulations. However, nothing in the Direction Regulation requires that "authorized individuals" receive their authority from the GSA. Nor would such a requirement make practical sense. As explained above, Congress enacted the delegating statute under which the regulations were promulgated to "ensure [the] use [of federal property] for the authorized purpose." *Cassiagnol*, 420 F.2d at 876. An immigration judge is authorized to ensure proper use of a courtroom over which the judge presides, including maintaining order over that courtroom. Even Moriello's own definition of "authorized individuals" is inconsistent with her proposed requirement that their authority derive from GSA regulations. Moriello asserts that "authorized individuals" include "individuals of a similar nature to Federal police officers," including "individuals such as United States Marshals." Opening Br. at 43. Yet, United States Marshals—like immigration judges—work for the Department of Justice and do not receive their authority from GSA regulations. *See Chabal v. Reagan*, 841 F.2d 1216, 1219 (3d Cir. 1988) ("United States Marshals are officers of the Department of Justice." (citing 28 C.F.R. § 0.5(a))).

16

PSOs also have the authority to issue lawful directions. PSOs are legally authorized "to detain" people, "conduct administrative searches," and "put people on notice." J.A. 168. They are required "to be in uniform," and they "look like an actual police officer" with "a badge, gun," and "patches on their shoulders" that show they have a relationship with the Department of Homeland Security. J.A. 169. Except for the authority to make an arrest, they have the full authority of FPS officers, including the "authority to enforce the Federal Management Regulations" at the court facility. J.A. 168–69. To strip PSOs of the authority to issue lawful directions would be to render them toothless.

Second, Moriello argues that neither Judge Pettinato's nor PSO Bridges's instructions to stop using her phone were "lawful" because no federal regulation prohibited such use. To the contrary, a violation of federal regulations is not a prerequisite for a lawful direction. Judge Pettinato had the authority to give lawful directions during proceedings over which he presided for the purpose of "maintain[ing] control over the courthouse and over the conduct of persons in the courthouse." *Stevens*, 877 F.3d at 1305. That authority included instructing persons in the courtroom to cease distracting conduct. PSO Bridges was authorized as the courtroom bailiff to convey Judge Pettinato's lawful directions to the same extent that Judge Pettinato was authorized to give those directions himself. As the courtroom bailiff, PSO Bridges also had the authority to maintain proper order within the courtroom separate and apart from the presiding judge's authority. That authority included directing Moriello to cease distracting conduct.

The district court correctly interpreted the Direction Regulation.

17

E.

Finally, we consider Moriello's argument that the government failed to present sufficient evidence to support her conviction under Count Two. Relevant here, the Conduct Regulation prohibits "[a]ll persons entering in or on Federal property . . . from loitering, exhibiting disorderly conduct[,] or exhibiting other conduct on property that . . . [o]therwise impedes or disrupts the performance of official duties by Government employees." 41 C.F.R. § 102-74.390. Moriello argues that the government failed to sufficiently prove that she disrupted the duties of Judge Pettinato.

Courts have applied similar regulations to conduct causing relatively minor disturbances. *See, e.g.*, *United States v. Renfro*, 702 F. App'x 799, 808 (11th Cir. 2017) (per curiam) (concluding evidence that "employees who had been working left their offices to check on what was happening" was sufficient to support finding that defendant "caused a disturbance that impeded the VA's normal operations"); *United States v. Agront*, 773 F.3d 192, 199–200 (9th Cir. 2014) (concluding evidence that altercation could be "heard inside the facility" and that two employees "were drawn away from their ordinary tasks to monitor the situation" was sufficient to establish a disturbance).

Moriello does not dispute any of the underlying facts. She used her phone during ongoing immigration proceedings. Her conduct prompted Judge Pettinato to go off the record to direct PSO Bridges to order Moriello to put her phone away. When PSO Bridges requested that Moriello stop using her phone, she refused—repeatedly. Moriello stood up and moved to the back of the courtroom while PSO Bridges continued to try to get her to either stop using her phone or leave the courtroom. PSO Bridges requested help from a

18

second PSO, but together the two PSOs were still unable to convince Moriello to either stop using her phone or leave—all while the immigration proceedings remained ongoing. Judge Pettinato testified that he found Moriello's phone use and her resulting interaction with PSO Bridges and the additional officers to be "very disrespectful," "very distracting," and "very disruptive visually." J.A. 217–18. He eventually called a recess to allow the PSOs to resolve the situation. We have little difficulty concluding that Moriello's conduct was sufficiently disruptive to Judge Pettinato's official duties to satisfy the second element of Count Two.[3]

Moriello also argues that her conduct could not have disrupted the official duties of PSO Bridges, because—though she apparently concedes that her conduct sufficiently disrupted PSO Bridges's duties—PSO Bridges is not a "Government employee." Because we find that Moriello's conduct disrupted Judge Pettinato, we need not consider whether PSO Bridges, a contractor, is a government employee.

Finally, Moriello argues that she is entitled to reversal of her conviction if we conclude that she disrupted the official duties of either Judge Pettinato or PSO Bridges, but not both. "[W]hen a general verdict of guilty rests on two alternative theories of prosecution, one valid and the other invalid, the verdict should be set aside if it is

---

[3] Although Moriello argued that immigration judges are not government employees to the district court, she did not present that argument to this Court on appeal and we therefore consider it forfeited. Regardless, immigration judges—as employees of the Department of Justice—are clearly government employees. *See Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 670 (D.C. Cir. 2016) ("Immigration judges are career civil-service employees in the Department of Justice's Executive Office of Immigration Review." (citing 8 U.S.C. § 1101(b)(4))).

'impossible to tell which ground the jury selected.'" *Bereano v. United States*, 706 F.3d 568, 577 (4th Cir. 2013) (quoting *Yates v. United States*, 354 U.S. 298, 312 (1957)). Here, the magistrate judge did not issue a written opinion; rather, he simply announced at the end of the bench trial that "the Government has proved these two offenses beyond a reasonable doubt." J.A. 300. However, an alternative-theory error is "subject to harmless error review." *Bereano*, 706 F.3d at 577. An error made during a bench trial is harmless if "it is clear that a rational fact finder would have found [the defendant] guilty absent the error." *United States v. Palin*, 874 F.3d 418, 422 (4th Cir. 2017) (alteration in original) (quoting *United States v. Poole*, 640 F.3d 114, 120 (4th Cir. 2011)). It is indeed clear here "that a rational fact finder would have found [Moriello] guilty absent the error" based on her disruption of Judge Pettinato's official duties. *Id*. Thus, even if PSO Bridges does not qualify as a "Government employee" under § 102-74.390, the resulting alternative-theory error would be harmless.

The district court properly found that sufficient evidence supports Moriello's conviction under Count Two.

## IV.

It should come as no surprise that immigration judges and courtroom bailiffs have the authority to reasonably control the conduct of persons within their courtrooms. For the foregoing reasons, the district court's judgment is

*AFFIRMED*.

20