**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-1954**

_____

YAGOUB M. MOHAMED, individually and on behalf of all others similarly situated,

        Plaintiff – Appellant,

v.

BANK OF AMERICA N.A.,

        Defendant – Appellee.

------------------------------

CONSUMER FINANCIAL PROTECTION BUREAU,

        Amicus Supporting Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge. (1:21-cv-01283-CCB)

_____

Argued: October 24, 2023                      Decided: February 16, 2024

_____

Before HEYTENS and BENJAMIN, Circuit Judges, and Elizabeth W. HANES, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Heytens wrote the opinion, which Judge Benjamin and Judge Hanes joined.

_____

**ARGUED:** Jessica Garland, GUPTA WESSLER PLLC, San Francisco, California, for Appellant. William M. Jay, GOODWIN PROCTER, LLP, Washington, D.C., for Appellee.

Lauren Gorodetsky, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Leonard Bennett, Craig Marchiando, Tara Keller, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Robert William Murphy, LAW OFFICE OF ROBERT W. MURPHY, Charlottesville, Virginia; Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellant. Thomas M. Hefferson, Rohiniyurie Tashima, GOODWIN PROCTER LLP, Washington, D.C., for Appellee. Seth Frotman, General Counsel, Steven Y. Bressler, Deputy General Counsel, Kristin Bateman, Assistant General Counsel, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus Curiae.

———————

TOBY HEYTENS, Circuit Judge:

Yagoub Mohamed appeals a judgment concluding the pandemic unemployment assistance benefits he was to receive via a prepaid debit card were not protected by the Electronic Fund Transfer Act. We conclude the relevant account was a "government benefit account" under the controlling regulations. We thus vacate and remand for further proceedings.

I.

During the COVID-19 pandemic, the federal government took many steps to address the ongoing crisis. As relevant here, the Pandemic Unemployment Assistance program expanded unemployment benefits to people who were not otherwise eligible, including self-employed workers. See 15 U.S.C. § 9021. The program was administered at the state level, through agreements between the Secretary of Labor and relevant state agencies. § 9021(a)(4), (f)(1). In Maryland, that agency was the Department of Labor's Division of Unemployment Insurance, which processed applications and contracted with Bank of America N.A. (Bank) to disburse benefits via prepaid debit cards.

When the pandemic began, Mohamed was working as a self-employed mechanic. In July 2020, he applied for unemployment benefits, and was found eligible to receive $14,644 between July and October 2020. Mohamed signed up to receive his benefits on a Bank-issued debit card mailed to his home.

Mohamed's card was slow to turn up. By November, a government representative told Mohamed the card should have arrived and directed him to contact the Bank. A Bank representative told Mohamed it had mailed the card but would send a new one. In

3

December, Mohamed received and attempted to activate the new card. He soon discovered the card had a zero balance and the entire $14,644 had been spent between August and October on transactions he did not recognize. The Bank opened an error claim and told Mohamed to file a police report, which he did.

Things continued to go poorly. In January, Mohamed got a letter from the Bank saying it had frozen his account because of possible fraud. Then, in February, the Bank emailed Mohamed stating it had deposited $1,050 into the account. Over the next two months, repeated calls to the Bank yielded conflicting answers about the status of Mohamed's account and the state of his fraud claim.

In May, Mohamed sued the Bank in federal district court, asserting its conduct and error-claim procedures violated the federal Electronic Fund Transfer Act and various state law obligations. The next month—more than six months after the initial error claim—the Bank told Mohamed it would credit him for the full amount of his unemployment benefits.

The Bank then moved to dismiss Mohamed's complaint for failure to state a claim. The district court granted that motion with respect to Mohamed's federal claim and declined to exercise jurisdiction over the state-law claims. Mohamed appeals the dismissal of his federal claim, which we review de novo. See, *e.g.*, *Nadenla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022).

## II.

This appeal turns on a single question: were Mohamed's benefits in a covered "account" under the Act and its implementing regulations? Indeed, the Bank conceded before the district court that, if the answer is yes, "Mohamed has a claim at least for

4

statutory penalties." JA 220.

So what is an "account"? The Act defines the term broadly, stating it:

means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i) of this title), as described in regulations of the Bureau, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement[.]

15 U.S.C. § 1693a(2).

The "Bureau" referenced in that provision is the Consumer Financial Protection Bureau, 15 U.S.C. § 1693a(4), and the "regulations" further defining "account" are published at 12 C.F.R. § 1005.2(b)(1). Those provisions are contained in a broader regulation called Regulation E.

The current regulations state the term "account" "includes a prepaid account," and further define "[p]repaid account" as including four categories that are introduced by the capital letters A, B, C, and D. See 12 C.F.R. § 1005.2(b)(3), (i). Subsection A—which no one claims is implicated here—brings in "payroll card account[s]" issued by employers. § 1005.2(b)(3)(i)(A). Subsection B covers "'government benefit account[s],'" which are defined (subject to an exception not implicated here) as "an account established by a government agency for distributing government benefits to a consumer electronically." §§ 1005.2(b)(3)(i)(B), 1005.15(a)(2). Subsections C and D, in turn, sweep in accounts used to conduct transactions with "multiple, unaffiliated merchants for goods or services" or that can be used "at automated teller machines." § 1005.2(b)(3)(i)(C), (D). Another provision states the broad definitions contained in Subsections C and D—but not

5

Subsections A or B—do "not include" various accounts, including "[a]n account that is directly or indirectly established through a third party and loaded only with qualified disaster relief payments." § 1005.2(b)(3)(ii), (B).

## III.

On appeal, Mohamed asserts he had a qualifying account under three provisions: Subsections B, C, and D. Because we conclude Mohamed is right about Subsection B, we do not reach his arguments about the other two subsections.

## A.

Before reaching the merits, we must address a question about forfeiture. Mohamed's lead argument is that the Act applies because he had a "government benefit account" under Subsection B. The Bank insists this argument is forfeited because Mohamed failed to raise it in the district court. See *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004) ("Absent exceptional circumstances, . . . we do not consider issues raised for the first time on appeal."). Mohamed says he preserved a Subsection B argument, and, even if he did not, we should exercise our discretion to overlook the forfeiture.

The forfeiture question is close. In the end, however, we conclude Mohamed did enough to preserve the issue.

Mohamed's complaint—the pleading whose sufficiency we are assessing—is broad enough to include a claim that Subsection B applies here. The complaint asserts that Mohamed "maintained a debit card account, which is an 'account' as defined by 15 U.S.C. § 1693a(2)." JA 37. As discussed, the cited provision defines "account" by reference to "regulations of the Bureau," 15 U.S.C. § 1693(a)(2), which, in turn, include

6

Subsection B, see 12 C.F.R. § 1005.2(b)(3)(i)(B).

Mohamed likewise preserved an argument that Subsection B applies in his brief opposing the Bank's motion to dismiss. In its memorandum supporting that motion, the Bank argued that none of Subsections A through D applied. Supplemental Appendix (SA) 12–13 n.4. In response, Mohamed described "[t]he pertinent regulations" as Subsections B, C, and D; quoted those regulations in full; and asserted that his "account satisfies the definition of 12 C.F.R. § 1005.2, *B through D*." SA 43–44 (emphasis added). The only argument abandoned in that brief was one based on Subsection A.

True, Mohamed's brief opposing the Bank's motion to dismiss focused mostly on rebutting the Bank's assertion that the funds constituted "qualified disaster relief payments"—an issue all now agree is relevant only to Subsections C and D. The Bank also makes much of Mohamed's statement that "[s]ince the prepaid account does not meet the qualified disaster relief exception, whether it was a government benefit card does not supply any grounds for dismissal." SA 48. But when read in its full context, that statement reflects Mohamed's reliance on alternative theories, not an abandonment of any argument about Subsection B. Just before the quoted statement, Mohamed made several arguments that the account was a "government benefit account"—the very assertion necessary to show the account was covered by Subsection B. For example, Mohamed asserted that the Bank's "conten[tion] that the account is not a government benefit" account conflicted with the Bank's having "identified the account as a 'Government Prepaid Debit Card' in the Cardholder Agreement." SA 47. Mohamed also put his finger on the key issue for resolving the Subsection B question, asserting that he "properly pled that he submitted an application

7

through" the state-provided process and that Maryland officials—not the Bank—"opened" the relevant account. SA 49; see Part III(B), *infra*.

The Bank relies heavily on Mohamed's arguments during the hearing on its motion to dismiss. The Bank went first. In response to a question from the court, the Bank asserted Subsection B did not apply because the account was not "established by a government agency" before pivoting to a longer discussion about whether the payments were qualified disaster relief payments (an issue that, again, is relevant only to Subsections C and D). See JA 244–47. In his own presentation, Mohamed did not respond to the Bank's argument about Subsection B, focusing on rebutting the Bank's claim about the qualified disaster relief payments issue. When closing his argument, Mohamed stated:

> So our view on this is that the Electronic Funds Transfer Act applies on its very face, and that we have stated a cause of action for Count 1 not subject to the carve-out. Your Honor, I don't have any further argument with respect to Count 1.

JA 268.

The Bank insists Mohamed's statement that he did not have "any further argument" effectively conceded any claim under Subsection B. That is not how oral arguments work. We may take judicial notice that parties' verbal presentations often do not touch on every point raised by the briefs or an opposing parties' argument, and a failure to do so is not forfeiture. At any rate, when asked directly whether he was "relying on an argument that this is a government benefit card," Mohamed responded: "It is a government benefit account." JA 268–69. Mohamed then acknowledged the Bank's "view" that Subsection B did not apply because "they are the ones that established" the account before pivoting to

8

an argument that resolution of the Subsection B question did not "make[] . . . much [of] a difference in determining whether the [Act] applies" because the account qualified under Subsections C and D. JA 268–69.

No question, Mohamed could have done more to develop his repeated assertions that Subsection B applies and to explain how his arguments about these (admittedly intricate) provisions fit together. So it is understandable that the district court did not specifically address Subsection B in its ruling, focusing instead on the qualified disaster relief payments issue that dominated both sides' briefing and argument. Having reviewed the entire record, however, we conclude Mohamed did enough to "signal" that he "contested" the Bank's view about Subsection B and to put the district court "on notice" of the parties' dispute. *In re Under Seal*, 749 F.3d 276, 288–89 (4th Cir. 2014); accord *Maynard v. General Elec. Co.*, 486 F.2d 538, 539 (4th Cir. 1973) ("While we will not consider new causes of action raised for the first time on appeal, any theory plainly encompassed by the pleadings . . . should be considered on appeal." (alterations and quotation marks removed)).

## B.

On the merits, we conclude Mohamed has stated a claim under the Act because the relevant account is a "government benefit account" under Subsection B. No one asserts we owe any deference to the agency, so our task is to construe the regulation as written. In doing so, we apply the "traditional tools of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quotation marks removed); accord *United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020) ("This Court construes a regulation using the same rules applicable to

9

statutory construction.").

We start, as always, with the text. The regulations define "government benefit account" as:

> an account established by a government agency for distributing government benefits to a consumer electronically, such as through automated teller machines or point-of-sale terminals, but does not include an account for distributing needs-tested benefits in a program established under state or local law or administered by a state or local agency.

12 C.F.R. § 1005.15(a)(2); see § 1005.2(b)(1)(i)(B) (adopting this definition). The Bank does not dispute this account was established "for distributing government benefits to a consumer electronically," nor does it assert that the "does not include" carveout is triggered. The merits issue before us thus distills down to whether the relevant account was "established by a government agency."

The regulations do not further define "established by a government agency," so we consider the words' "ordinary meaning" and the "context" in which they are used. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quotation marks removed). As used here, "establish" means "to bring into existence"[1] and "by" means "through the agency or instrumentality of."[2] Thus, our ultimate question: was Mohamed's account brought into existence through the agency or instrumentality of a government agency?

Of course it was. Congress created the Pandemic Unemployment Assistance

---

[1] *Establish*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/establish [https://perma.cc/5R5Y-V8DB]; accord *Establish*, Black's Law Dictionary (11th ed. 2019) ("To make or form; to bring about or into existence.").

[2] *By*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/by [https://perma.cc/Z72U-YZLF].

10

program and made agreements with States (including Maryland) to administer it. 15 U.S.C. § 9021(f)(1). A state agency created an application procedure, received applications, made benefits determinations, and gave the Bank a list of people who should be issued benefit cards. True, the Bank issued the cards and controlled the day-to-day operations of the attached account, such as providing recipients with account access and histories. But the Bank acted solely at the instigation of—and through its contract with— the State of Maryland.

The underlying principle is a familiar one. Consider the situation where a person walks into a bank branch and says she wants to open an account. Yes, a bank teller—not the customer—will be the person who physically creates the account, most likely through a series of keystrokes on the bank's computers. But that does not mean the account was "established" exclusively by the bank (much less by its teller). Rather, it was the customer whose actions brought about the account's existence by asking the teller to open it on her behalf. So too here.

The Bank offers a flurry of arguments against this straightforward conclusion. We are unpersuaded.

The Bank insists that "[u]nder any meaning of established," it "made or formed these accounts and brought them into existence." Bank Br. 30 (alterations and quotation marks removed). But the relevant definition does not turn on who "established" an account in a general sense or direct us to determine whether a party other than a government agency might have played a role in its happening. Instead, the regulation asks whether the account was "established by a government agency," regardless of whether the account *also* might

11

be said to have been established by someone else or whether the government recruited a private party to assist with its efforts. And, as we have already explained, the initiating party here was Maryland.

The Bank also contends that "[t]he larger regulatory context confirms that Mohamed's account is not a government benefit account." Bank Br. 31. The Bank emphasizes that an adjacent regulatory provision says "[a] government agency" that undertakes certain actions "is deemed to be a financial institution for purposes of the Act" and thus takes on a host of new obligations the relevant Maryland agency has never complied with. 12 C.F.R. § 1005.15(a)(1). According to the Bank, this shows that it—not that agency—established Mohamed's account because otherwise the agency would be "deemed to a be a financial institution" under that provision.

That argument omits the other requirement in the relevant regulation. The regulation the Bank cites does not say a government agency must be deemed to be a financial institution before it can establish an account or that any government agency that establishes an account is, without more, deemed to be a financial institution subject to additional obligations. Instead, the regulation declares that, to be deemed a financial institution, a government agency must *also* "directly or indirectly . . . issue[] an access device to a consumer for use in initiating an electronic fund transfer of government benefits from an account." 12 C.F.R. § 1005.15(a)(1). But the only "access device" at issue here is the physical card itself, and the parties agree that card was issued by the Bank. See § 1005.2(a)(1) (defining "access device" as "a card, code, or other means of access to a consumer's account"); Oral Arg. 29:20–29:33 (Bank conceding it issued the access

12

device). When asked about this point at oral argument, the Bank responded by pointing out the regulation applies even if Maryland only "indirectly" issued the card. See Oral Arg. 29:40–30:28. But the Bank never once argues in its briefing that Maryland issued an access device—directly or indirectly—which leaves without substantial support the Bank's suggestion that our holding might render the relevant state agency a regulated financial institution.

Finally, the parties have a spirited back and forth about the regulation's evolutionary history and how well a conclusion that Mohamed's account is covered by Subsection B fits within the overall scheme. Of course, we must read the regulation's words—just like a statute's—"in their context and with a view to their place in the overall [regulatory] scheme." *Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017); accord *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 197 (4th Cir. 2021) (examining "the historical language of" the relevant regulations). Having done so, we conclude the relevant contextual clues point sharply in Mohamed's favor.

*First*, the 1994 Rule that extended Regulation E to electronic distribution of government benefits said a government benefit account is "an account established by a government agency" "*whether or not the account is directly held by the agency or a bank or other depository institution*." Electronic Fund Transfers, 59 Fed. Reg. 10678, 10680 (1994) (emphasis added). That Rule thus distinguished between who "established" an account and where (or by whom) the account is "held." See Bank Br. 38 (acknowledging that "'holding' an account is not the same as 'establishing' one").

*Second*, the 2016 Rule that extended Regulation E's coverage by adding

13

Subsections C and D again acknowledged that "government benefit account programs are typically administered by financial institutions pursuant to a contract between the institution and the agency." Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z), 81 Fed. Reg. 83934, 84001 (2016). That Rule thus recognized that States regularly contract with third parties, such as banks, to administer government benefit programs without changing the program's essentially governmental nature.

*Third*, it appears the Bank's proposed interpretation would—at least as a practical matter—render Subsection B a dead letter. The Bank would have us hold that no prepaid card issued as part of a government program is a government benefit account unless the funds are pulled directly from the government's coffers. But when asked at oral argument, the Bank could not identify a single modern example of a government benefit program that works that way or even state with certainty whether such a system has ever existed. See Oral Arg. 24:25–27:28; accord Oral Arg. 13:15–13:20 (CFPB counsel representing "[t]he Bureau isn't aware of a single government agency that operates a program on its own").

The Bank responds that Subsection B is not meant to have independent significance after the 2016 Rule, which added two new expansive categories of prepaid accounts (Subsections C and D). But that argument does not explain how electronic government benefit cards were covered *before* the 2016 Rule, which stated it did not "narrow or expand" "the scope of coverage for government benefit accounts." 81 Fed. Reg. at 83995–96. Nor does it explain why the exclusions applicable to the new, broader categories—

14

including those for cards "loaded only with qualified disaster relief payments," 12 C.F.R. § 1005.2(b)(3)(ii)(B)—were not made applicable to Subsection B, which further suggests that Subsection B would still have some effect. Indeed, the Bank does not identify any reason why the 2016 Rule would have retained Subsection B if that provision was not meant to have any real-world significance. Cf. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires." (quotation marks and citation removed)).

\*        \*        \*

We hold Mohamed has stated a claim under the Act because his pandemic assistance benefits were held in a "government benefit account." The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*

15